**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF NEW JERSEY**

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

| | |
|---|---|
| LARAINE CONTE and JANET GUARINO, | Civil Action No.: |
| Plaintiffs, | |
| vs. | **NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. § 1441 (DIVERSITY CITIZENSHIP)** |
| SAM SHEAR and MIKE WINBERG Individually and as Principals, Managers of def. PREMIER WATERPROOFING LLC, and JOHN DOE and ABC CO., | |
| Defendants. | |

NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE ENTITLED COURT:

PLEASE TAKE NOTICE that Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC hereby removes to this Court the state court action described below.

1.   On or about October 13, 2020, an action was commenced by Plaintiff in the Superior Court of New Jersey, Law Division, Mercer County, entitled Laraine Conte, et al. v. Sam Shear, et al. and bearing docket number MER-L-001810-20. A copy of the Complaint in the state court action is attached hereto as "**Exhibit A**."

2.   Defendant Sam Shear was never personally served with a summons and complaint in the State matter but as of today, November 18, 2020, acknowledges receipt of the summons and complaint. Pursuant to 28 U.S.C. § 1446(b), this notice has been timely filed. A copy of the Acknowledgment of Service by Mr. Shear and a Certification of facts are attached hereto as

"**Exhibit B**."

3.    Although a process server was sent to Sam Shear's personal residence in an attempt to serve Defendant Mike Winberg, such service is not appropriate and is therefore invalid. However, as of today, November 18, 2020, Mr. Winberg acknowledges receipt of the summons and complaint. Pursuant to 28 U.S.C. § 1446(b), this notice has been timely filed. A copy of the Acknowledgment of Service and Certification of facts by Mr. Winberg are attached hereto as "**Exhibit C**."

4.    Defendant Premier Waterproofing LLC was served with summons on October 13, 2020 and received a copy of Plaintiff's complaint on October 13, 2020. Premier Waterproofing consents to removal to the Federal District Court. A copy of the Affidavit of Service for Premier is annexed hereto as "**Exhibit D**."

5.    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this court by defendant pursuant to the provisions of 28 U.S.C. § 1441 in that it is a civil action wherein the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.    Sam Shear is an individual residing in Bucks County, Pennsylvania.

7.    Mike Winberg is an individual residing in Bucks County, Pennsylvania.

8.    Premier Waterproofing LLC is a business entity formed pursuant to the laws of Pennsylvania with its registered business address in Bucks County, Pennsylvania.

9.    All Defendants have joined in this notice of removal.

WHEREFORE, Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC prays that this action be removed to the United State District Court for the District of New Jersey.

Dated: November 18, 2020

By: *Jeffrey Heldman /s/*

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

# EXHIBIT A

KATZ & DOUGHERTY LLC
4020 Quakerbridge Road
Mercerville, New Jersey 08619
(609)587-1199
ATTORNEYS FOR THE PLAINTIFFS
George T. Dougherty, Esq., 247791969

|  |  |
|---|---|
| LARAINE CONTE and<br>JANET GUARINO,<br><br>　　　　Plaintiffs,<br><br><br>　　　　v.<br><br>SAM SHEAR, and MIKE WINBERG<br>Individually and as<br>Principals, Managers of def.<br>PREMIER WATERPROOFING, LLC<br>and JOHN DOE AND ABC CO.<br><br>　　　　Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, MERCER COUNTY<br><br><br>DOCKET NO. MER<br><br>CIVIL ACTION<br><br>COMPLAINT AND JURY DEMAND<br><br>(CONTRACT, CONSUMER FRAUD, LEGAL FRAUD) |

The plaintiffs, Larraine Conte and Janet Guarino, by way of complaint against the defendants, say:

## GENERAL ALLEGATIONS PERTINENT TO ALL COUNTS

**The Parties**

1. At all times relevant to this matter:

    a. Plaintiff Laraine and her late husband Mark Conte were the owners and occupants of a single family residence located at 78 Wilburtha Road, Ewing Township, Mercer

1

County, New Jersey, hereinafter referred to as "the Subject Property;

b. Plaintiff Janet Guarino resided at 118 Crosswicks Street, Floor 2, Bodentown, New Jersey 08505 and is the sister of plaintiff Laraine Conte (referred to herein as "plaintiff Guarino").

c. Defendants Sam Shear and Mike Winberg were and are principals, members, managers, agents and/or employees of defendant Premier Waterproofing, LLC, a business entity organized under the laws of Pennsylvania, with principal offices at 252 Walton Drive, Morrisville, Pennsylvania, (hereinafter referred to collectively as "Premier" and/or by individual sir name).

d. Premier was and is engaged in the business of diagnosing, abating and preventing water and moisture infiltration and remediating and removing resultant mold growth.

2. Such remediation services, when rendered for residential homes in the State of New Jersey, constitute "Home Improvement" services as defined and regulated by the State of New Jersey Office of the Attorney General Division of Consumer Affairs.

3. Although defendants Shear and Winberg were and are individually registered and licensed by the New Jersey Division of Consumer Affairs to perform Home Improvement Contracts within

2

the State of New Jersey, during all times pertinent to this action, their business entity, defendant Premier Waterproofing, LLC, was neither registered as a Foreign Business Entity in New Jersey, nor registered as a Home Improvement contractor with the New Jersey Division of Consumer Affairs.

4.  John Doe and ABC Co. are fictitious names intended to designate one or more individuals or entities who, independently or together with the Premier defendants, may have liability to the plaintiffs for the acts or omissions and violations and losses complained of herein.

### Facts Pertinent to All Counts

5.  In early 2018, the plaintiff and her husband Mark became aware of water intrusion in a portion of their basement and resultant mold growth within the basement of their home.

6.  To address the problem, they contacted several contractors, obtaining several estimates from contractors who were listed on popular home improvement web sites, all but one of which were between $18,000 and $19,000.

7.  On February 15, 2018, plaintiff Laraine Conte and her husband, Mark Conte selected the proposal of Acqua Dry Basement Waterproofing signing a contract for a total price of $18,630.

8.  Among the contractors responding to plaintiff's request for a proposal was defendant Premier, whose agent or principal,

3

defendant Winberg, appeared at their house on February 16, 2018 to prepare an estimate.

**Defendants' Creation of False Sense of Hazard and Urgency**

9. During his visit, and before making any examination of the actual moisture and mold conditions within the house, defendant Winberg observed that plaintiff's husband, Mark, was on continuous oxygen for a chronic medical condition and began to exploit Mr. Conte's medical condition to create an exaggerated sense of urgency to engage defendant Premier to address the moisture/mold conditions within the home.

10. Unlike the other prospective contractors, without having identified the species of mold or other air quality issues, and without having acquired any insight into plaintiff's husband's actual medical condition by which to connect the mold issues to his particular health issues, defendant Winberg declared to the plaintiff and her husband that it was "imperative" that the cellar mold condition be addressed "ASAP", quoting a price of $21,000.

11. On February 22, 2018, while seated at a table with plaintiff and her husband, defendant Winberg stressed his point that their basement remediation needed to be done immediately or *"Mark's cancer could come back and Mark could become ill again."*

12.   His remarks put plaintiff and her husband in fear of causing him to suffer a major health setback by delaying the commencement of the moisture and mold remedial work, which causing them to cancel their contract with Aqua Dry Basement Waterproofing, to whom they had given $3,726 on February 15, 2018, which cancellation was confirmed by Acqua Dry on February 19, 2018.

13.   Without providing the plaintiff and her husband with a laboratory mold analysis report, defendant Winberg maintained that he could tell the mold was a threat to Mark's health because he viewed it through his ""naked eye" and knew there was mold because he was "the expert."

14.   The Contes' fear of delaying the remediation work was fanned by defendant Winberg's insisting that, before the remediation work could be started, he and plaintiff Conte would have to go through each of the items in storage in their basement to determine which items she wanted to save and what items she would approve for disposal.

15.   For further dramatic effect, in the presence of plaintiff's sisters, Teresa and Janet Guarino, defendant Winberg falsely declared that he and the plaintiff would have to wear "Hazmat" protective coveralls and breathing masks while sorting through the stored property in the basements due to the amount of mold

within the basement and observable on the interior surfaces and on some of the stored items.

16.   Noticing the plaintiff's sensitivity to her husband's state of health, defendant Winberg induced the plaintiff to accept his $21,000 estimate by representing to her that her husband's condition required an *immediate remediation* of the mold.

17.   Prompted by Winberg's false material representations of the dangerous condition of their home combined with his false promises to protect the plaintiff's interests in protecting and retaining the personal property stored in her basement after inspecting each one jointly with the plaintiff marking them according to plaintiff's decision to retain or discard, plaintiff and her husband engaged the higher-priced Premier in place of Acqua Dry and other lower bidding contractors,.

**Laying Groundwork for Plan to Loot Plaintiff's House**

18.   The seeds for defendants' plan to steal the contents of plaintiff's basement while pretending to be performing remediation work in a hazardous environment took the form of persistent lies by Winberg, stressing - without any laboratory testing - that the basement mold remediation work could not be delayed in the interest of plaintiff's husbands' health combined with Winberg's false representations to win the plaintiff's confidence, such as:

a. Premier could start the work sooner than the competing contractors, whose prices were several thousand dollars lower;

b. Winberg would personally supervise the remediation work;

c. Before the remediation work began, he would personally work with the Contes in "tagging" the items that they would retain and items they would discard; and

d. The plaintiff and her husband would be able to decide which items to be "tagged" for disposal.

19.    Each of Winberg's representations proved to be totally false because:

a. Premier could not have lawfully started the work on the Contes' home without having a proper home improvement contract signed by the Contes;

b. Premier was not licensed to conduct home improvement services in New Jersey, pursuant to the New Jersey Administrative Regulations for Home Improvement practices;

c. As plaintiff learned from "Peter" who was in charge of the Premier work on her house on February 28, 2018, in the presence of her sisters Janet and Teresa Guarino, defendant Winberg was not supervising her job, and was "gone all day" supervising another job; and

d.    Contrary to Winberg's representation that a selection and tagging process would be conducted to save from

disposal the stored items of value to the Contes, no such process occurred. Instead, the workers were invited by Premier to take whatever property they wanted.

**The Premier Contract**

20. On February 22, 2018 defendant Winberg presented an unsigned Premier Contract to address the water infiltration and mold remediation in the amount of $21,000.

21. The Contes explained that they were not in a position to enter into the contract without financial aid from her sisters, to which Winberg remarked that he could resolve that problem with "Green Sky", a financial company with which he worked to obtain financing for his customers.

22. In order to facilitate her sister's urgent need for Premier's services Janet Guarino signed a Green Sky financing agreement for the $21,000 Premier contract

23. Although the defendants had not signed a contract to perform any remediation services, Winberg set a *start date* of February 28, 2018 on the project in violation of Consumer Fraud Act.

*24.* To reduce the chance of their planned looting of the Contes' stored property being discovered, Winberg told plaintiff and her husband that they should vacate their house when the work was in progress, discouraging them from entering into the mold removal area without protective clothing and masks and

telling plaintiff and her husband *not to enter the basement when there was a plastic curtain hung from the ceiling.*

25.  In hindsight, the defendants chose to start work on February 28, 2018 without having a signed contract in violation of the New Jersey Consumer Fraud Act because Winberg was aware that the plaintiff and her husband had to be in Philadelphia for a doctor's appointment on that date.

26.  In hindsight, the plaintiff realized that the purpose of the plastic curtain was to serve as a sight barrier behind which Premier's theft of the entire content of the Contes' cellar on February 28, could be accomplished in a single day, without being interrupted or detected.

27.  In hindsight, having seen that their entire basement was looted by men wearing tee shirts and no breathing masks, and that there was not even a pretense about tagging and individual pieces of  property for retention, the plaintiff realized that Winberg lied to her and her husband about the dangerous conditions in their basement and as to his commitment to working with plaintiff in the selection of their property to retain.

**The Heist**

28.  Upon returning from the Philadelphia medical appointment on February 28, 2018, plaintiff observed a Premier worker carrying off her expensive Fortunoff patio chair and umbrella set, loading it into his van.

9

29.   In response to plaintiff's directive to return the items to where he found them, the worker tossed them onto the ground, saying that he was told that the Contes did not want the stored items and that he could keep what he wanted.

30.   In response to plaintiff's phone call to Winberg, reporting the theft of her property and what his worker was told about keeping what he wanted, Winberg said that the employee who took the property *would be fired.*

31.   Following up on plaintiff's phone call, defendant Winberg came to her home and went into the basement with plaintiff, observing that all plaintiff's property was gone.

*32.*   When asked where the property went, Winberg offered to make a call to the dumpster company to see if he could locate the property, only to report that he *could not get them back.*

33.   Shortly after her complaint to Winberg, plaintiff found a large container deposited by persons unknown on her front lawn containing Christmas lights and decorations that had been removed from her basement.

34.   Defendants Winberg and Shear made no further effort to locate or return her property to her, now claiming that the removal was performed by a subcontractor, not in his employ.

35.   Operating secretly and contrary to the express wishes of the plaintiff and her husband to retain a much of their stored property as they chose to retain, the defendant Premier and its

key principals, Winberg and Shear unlawfully allowed and permitted their employees or agents to remove *all of the stored items* in the basement, including items which were stored in dry sections of the basement and which plaintiff and her husband valued and did not want to be put into a dumpster as waste for disposal or to be taken and kept by the workers.

**Unauthorized Wall Finishes and Untouched Rafter Mold**

36.     During the time that she was negotiating the scope of the work and materials to be used, plaintiff made it clear to defendant Winberg that she wanted the cellar walls, after they were treated for moisture prevention and mold removal, to be simply covered with a plain white coating of a suitable paint product.

37.     Since the basement had no supplied heating, there was no purpose to be served by installing what appeared to be a form of insulation material on the wall's interior surface.

38.     However, on entering the basement to observe the disappearance of virtually all of their stored personal property, plaintiff was struck by the appearance of a "silvered" wall covering on the interior of her basement wall.

39.     When she reached defendant Winberg by phone, she exclaimed "how dare you not consult with me before doing this to the wall?" to which he responded: "It's too late." and "You should be happy -- it will make you warmer."

40.  When plaintiff demanded that the installation be taken down, Winberg responded dismissively: *That was not going to happen"*.

**"Shoddy, Second-String, Work."**

41.  On March 23, 2018 the Premier owner, defendant Sam Shear, made his first appearance at the Conte premises.

42.  On his review of the basement work of his company he described the work to plaintiff and her sisters Teresa and Janet Guarino as *"second string" and "shoddy work."*

**Return of Water Intrusion – Right-Hand Man Pablo**

43.  Beginning on March 23, 2018, plaintiff dealt directly with defendant Shear as "owner" of Premier.

44.  In response to plaintiffs' complaint that she had not authorized the silvery finish that was applied to her basement walls defendant Shear applied a new layer of wall covering which was brown in color.

45.  In response to plaintiff's complaint that water was continuing to enter the basement, defendant Shear assigned Pablo, his "right hand man", to redo the entire area under the basement steps by breaking the concrete and replacing it.

46.  Pablo's comments were the that job was not done right by the "second string" workers but was now corrected by his "first string" team.

47.     In response to plaintiff's report that she and her husband were deceived by his company, defendant Shear stated that he had fired Peter, and asked "what else do you want me to do?" and "How can I make this right?"

48.     Although plaintiff reported to the owner that she wanted her money back because the job was inferior and incomplete, defendant Shear offered to perform repair work on her sidewalk and driveway in compensation for Premier's "shoddy work."

**Premier's Failure to Remove Visible Mold**

49.     Despite his claims of urgency to remove the basement mold in the interests of Mark Conte's health, neither Winberg nor Peter (who was left in charge by Winberg) removed the mold which was easily visible on the exposed first floor framing (floor joists and bracing overhead in the basement).

50.     The mold condition in the basement was left untouched even after Premier owner Shear assumed control of the job, with his "right-hand" man Pablo.

51.     After many attempts to get a satisfactory response from Premier as to the completion of the basement mold removal and the other promised work on August 24, 2018, plaintiff declared to defendant Shear by phone that she was "finished with him".

52.     On September 18, 2018, plaintiff engaged mold removal expert Ray Nabi who confirmed that Premier had not removed the

mold accumulated on the basement rafters which were tested to be unacceptable.

53.    Plaintiff Conte proceeded to remove the mold using products and equipment commercially available for such purposes.

**Financing Fraud**

54.    As set forth in greater detail in Count III, Plaintiff Janet Guarino entered into a financing agreement on behalf of her sister and brother-in-law, with "Green Sky", a financial company utilized by Premier to allow its customers to engage Premier to perform home improvements, allowing Premier to draw down payments directly from the financing company.

55.    The financing agreement was signed for a total principal amount of $21,000 equal to the Premier total price for its contracted work.

56.    The terms of the Green Sky financing agreement expressly prohibited Premier from passing on to the borrower Green Sky's $4,200 charge to its participating merchants for its services.

57.    In violation of that restriction, and in a deceptive manner, Premier sent an invoice to plaintiff Guarino on which it added to the $21,000 total contract price, the sum of $4,000.00. for a total invoice of $25,000. (Exhibit A)

58.    In response to plaintiff Guarino's question about the added $4,000.00 charge, defendant Winberg stated that it was the

finance fee charged by Green Sky, not mentioning to her that Premier was prohibited from passing that fee on to the customer.

59. Being unaware of that prohibition, plaintiff Guarino paid the full $25,000.00 amount of the fraudulent invoice including interest on that amount.

## COUNT I

**(All Defendants -- Breach of Contract, Unjust Enrichment)**

60. All allegations set forth in the above "General Allegations" section are incorporated herein by reference as though set forth in full below.

60. Despite its failure to constitute a lawful contract for the purposes of complying with the Home Improvement Practices regulations of the N.J. Division of Consumer Affairs, the defendants' actions in providing such services as outlined in its February 15, 2018 proposal (Exhibit B) constitute an enforceable common law contract.

61. As set forth above in detail, the defendants breached their common law contract by:

a. Failing to complete the services for which they received more than full compensation by;

b. Failing to remove the mold on the ceiling (exposed sub flooring of the first floor above the basement);

c.   Inducing or allowing their employees, subcontractors or agents to remove the entire contents of the Conte's basement and to keep or otherwise dispose of them;

d.   Removing and converting to their own use and benefit, or disposing in an irresponsible manner many items of personal and material value to the plaintiff and her husband which were stored in the basement and which were not contaminated or beyond salvage, without notice to the plaintiff and without her authorization;

e.   Applying unwanted and unspecified wall finish material to the basement walls without notice to or approval of the plaintiff as a deviation from the plaintiff's order and instructions which were required to have been reduced to specific terms of a written, signed home improvement contract; and

f.   Altering the price of the contract set forth on the Proposal from $21,000 to $25,000 in violation of the terms of the proposal and in breach of the defendants' third-party benefit set forth in the Green Sky/Merchant Program Agreement.

62.  As a direct, proximate and foreseeable consequence of the defendants' contract breaches, aforesaid, plaintiff Conte has incurred monetary losses and is entitled to compensation by the defendants for:

a.   The reasonable costs of engaging a professional mold expert to confirm the continued presence of mold in her base less the costs of  removing the mold and related growth from the basement ceiling superstructure, and for the application of such preventive materials as called for in the defendants' Proposal;

b.   The reasonable costs of removing the unwanted basement wall finishes installed by the defendant against the wishes of the plaintiff and the preparation of the walls for recoating with an appropriate finish as requested at the inception of defendants' engagement;

c.   An accounting of the personal property removed by the defendants as to each item disposed of and of the manner of disposition and the proceeds received for their resale;

d.   Compensation for the reasonable value of all such salvageable property removed by defendants on February 28, 2018 and;

e.   The alteration of plaintiff Guarino's finance agreement to recover defendants' $4,200 Green Sky fee charged to defendant under its Merchant Financing Program which expressly protects the plaintiff as the Borrower against having that fee added to the Merchant's service transaction, together with the interest charges paid by plaintiff for defendants' $4,200 GreenSky fee.

63.    Should the defendant's proposal and services be deemed to be other than an enforceable contract, the plaintiff seeks equitable relief in the form of restitution based on the doctrine of unjust enrichment arising from the defendants' retention of the full $25,000 it obtained inequitably based on its failure to provide value for the amount of money received and by sheer fraudulent overbilling.

WHEREFORE the plaintiffs demand judgment against the defendants, jointly and severally for compensatory damages in such amount as shall be established at trial together with costs of suit and such other relief in as the Court may deem equitable.

## COUNT II

(All Defendants - Consumer Fraud –
Unregistered Business
Performing Work Without Contract)

64.    All prior allegations are incorporated in this Count as though repeated herein.

65.    The services undertaken by the defendants constituted a home improvement regulated by the Home Improvement Practices regulations adopted under the Consumer Fraud Act, (N.J.A.C. 13:45-16.2), hereinafter "the regulations".

66.    The defendant Premier violated the Consumer Fraud Act by being an unregistered Home Improvement Contractor and by

misrepresenting in its Proposal that it was authorized to do business in New Jersey.

67.  The defendants commenced remediation work on February 28, 2018 and continued the work into the month of August without ever having entered into a signed written contract stating the entire scope and the terms and conditions as it pertains to the work to be done, consideration to be paid, and other requirements of the Home Improvement Practice regulations of New Jersey Division of Consumer Affairs (N.J.A.C. 13:45A-16.2(a)12) ("HIP").

68.  As a direct consequence thereof, the plaintiff was deprived of a clear statement of the terms that she and the defendant Premier's principal orally discussed and agreed upon, resulting in the defendants' taking it upon themselves to do such things as:

> a.   Causing the removal and conversion to defendants' own use or benefit, or to the benefit of its employees, subcontractors or agents for the discarding, or reselling of all of the plaintiff's stored items without her input as to which she deemed salvageable or valuable enough to her to retain despite their condition;

> b.   Installing undesirable wall material on the basement walls instead of painting the walls with a simple white colored suitable material;

c.   Abandoning the incomplete project and substandard work and materials without removing the extensive mold growth on the basement ceiling; and

d.   Retaining the full $25,000 GreenSky transaction loan account established for the plaintiff's restoration before the work was finished and accepted, as required by the HIP.

69.  As the direct, proximate and foreseeable consequence of the aforesaid violations of the Consumer Fraud Act the plaintiff sustained substantial, ascertainable losses of money and property as set forth herein for which the defendants are liable to her.

**WHEREFORE**, the plaintiff demands judgment against the defendants, jointly and severally, for compensatory damages, statutory treble damages, nominal damages, interest, costs of suit and attorneys' fees.

### COUNT III

(All Defendants - CFA Violation Fraudulent Charge-back of Finance Charges)

70.  All prior allegations are incorporated herein as though set forth in full.

71.  Without being conscious of the statutory and regulatory requirements for home improvement contracts, the plaintiffs entrusted the project to the defendants based solely upon said unsigned proposal.

72.  As a further incentive to pay its $21,000 price for the
mold removal and remediation, defendant Winberg offered to
arrange "low rate" financing through "Green Sky" with which it
had a business relationship under its Green Sky/Merchant Finance
Program.

73.  Because plaintiff Conte was unable to finance the Premier
contract price of $21,000, defendant Winberg arranged for her
sister, plaintiff Janet Guarino, to be eligible to finance the
project through a company which provides such services in aid of
home improvement contactors, including Premier.

74.  The terms of that three-way arrangement required plaintiff
Guarino to authorize GreenSky to advance money to Premier as
when requested by Premier (through Green Sky) and authorized by
plaintiff Guarino.

75.  Because neither plaintiff Conte nor plaintiff Guarino had
experience in construction financing or installment payments,
and because there was no procedure by which Premier was required
to provide proof to plaintiff Guarino or to the Contes as to how
much of the $21,000 contract price had been earned by Premier,
neither plaintiff nor her sister were aware that Premier was
drawing more money from the $21,000 account than it was entitled
to, especially in view of the amount of money that was lost on
the first day of their work due to the Premier's unauthorized

disposal and asportation of thousands of dollars of personal property from the plaintiff's basement.

76.  Paragraph 5. b. of the Green Sky financing Terms required Premier to pay to Green Sky a $4200 "financing charge" which Premier was not permitted to charge back to the plaintiff or to her sister, plaintiff Guarino as an individual customer.

77.  Under Consumer Fraud Act Section N.J.S.A. 56:8-151 "Contracts - contents", defendants' contract with plaintiff was required to set forth in understandable language "*the total price or other consideration to be paid by the owner, including finance charges.*"

78.  The violation of that statute is also an unlawful business practice pursuant to the Division of Consumer Affairs Home Improvement Practices regulation N.J.A.C. 13:45A-16.2 (a) 6. v.

79.  The defendants' unsigned contract proposal stated the total price to be $21,000, (in black type) without any mention of "finance charges" to be added. (Exhibit B)

80.  In violation of N.J.S.A. 56:8-151 and N.J.A.C. 13:45A-16.2 (a) 6. v., defendants mailed a falsified invoice to plaintiff Guarino for payment of an additional $4,000 which was typed in red ink adding to $25,000.

81.  When called to the attention of defendant Winberg, his written response (Exhibit C) identified the new number as including Premier's finance fee to GreenSky, without disclosing

that he was prohibited Paragraph 5. b. of GreenSky's Terms and Conditions of financing Premier's contracts from passing that fee on to the customer.

82. Not being familiar with the GreenSky provision (Para. 5 b.) which protects her against being charged by the Premier for its fee paid to GreenSky, plaintiff Guarino paid the full amount of the Premier Invoice plus the Premier's financing fee and interest cost totaling $4,000.

*83.* By demanding and receiving the total contract amount on an unfulfilled, abandoned remediation project before it was completed, defendants Winberg, Shear and Premier constituted an unlawful business practice pursuant to the Division of Consumer Affairs Home Improvement Practices regulation N.J.A.C. 13:45A-16.2 (a) 6. v.

84. By mailing the falsely increased invoice for payment, the defendants committed mail fraud in violation of 18 U.S.C.S. § 1341.

**Defendant Premier Unregistered to do Business in New Jersey**

85. Although defendants Shear and Winberg were individually registered with the N.J. Division of Consumer Affairs as Home Improvement Contractors, at the time their company Premier began the performance of the mold remediation and prevention services set forth in its February 16, 2018 proposal to the plaintiff, defendant Premier was neither a registered Home

Improvement Contractor in New Jersey nor was it registered in New Jersey as a foreign (out of State) company to conduct any form of business in New Jersey.

86. Even if it had been registered as a foreign company to do business in New Jersey, Premier and its principals Winberg and Shear violated the most fundamental requirements of the Home Improvement Practice regulations of New Jersey Division of Consumer Affairs [N.J.A.C. 13:45A-16.2(a), and of the Consumer Fraud Act, N.J.S.A. 56:8-151a which required:

    a. A contract signed by the plaintiff and by the Premier's executive officer;

    b. Setting forth a full description of the services to be rendered;

    c. Setting for the dates and time period on or within the work is to begin and be completed by the defendants;

    d. Setting forth the legal name and business address of the sales representative or agent who solicited or negotiated the contract.

**WHEREFORE**, plaintiffs Laraine Conte and Janet Guarino demand judgment against the defendants, individually and severally, for compensatory damages, statutory treble damages, nominal damages, interest, costs of suit and attorneys' fees.

## COUNT IV

(Legal Fraud, Tortious Asportation and Conversion
of Property Compensatory and Punitive Damages)

87.  All prior allegations are incorporated in this Count as though repeated herein.

88.  Prior to signing defendant Premier's contract to remediate the moisture and mold condition of her basement, plaintiff made it very clear to defendant Winberg that she would not permit the contractor to discard any or all of her personal property stored in the basement other than items that she and her husband agreed to part with or store elsewhere to facilitate the contractors' work.

89.  To assure plaintiff of his company's intent to honor her right to determine which of the stored items were to be discarded, defendant Winberg represented to plaintiff that he or another Premier employee would work with her in the basement tagging items which were approved for disposal.

90.  To further assure her of the company's commitment to the protect her to the review process, plaintiff was cautioned that she would need to be dressed in Hazmat overalls and wear a protective breathing mask.

91.  Between the date of plaintiff Conte's signing the Premier contract and the February 28, 2018, defendant Premier failed to schedule an item review session with the plaintiff.

25

92.   On February 28, 2018, plaintiff's husband had a doctor's appointment in Philadelphia, Pennsylvania which caused them to be absent from their home for most of the day.

93.   On plaintiff's return, she encountered a Premier worker heading to his vehicle with her Fortunoff patio chairs and umbrella set, being told by the worker that he was permitted by defendant Winberg to take the property for himself.

94.   That encounter led to plaintiff's discovery that virtually all of the personal items in her basement had been removed.

95.   When confronted by plaintiff with this accusation, defendant Winberg admitted that he made that decision and told plaintiff that it was for her own good.

96.   In response to her demand made initially to defendant Winberg, and repeated to defendant Shear, the owner of Premier, both defendants claimed that they could not return the items to her because they had been taken away by people who were not Premier employees and could not be traced.

97.   By intentionally exercising control and dominion over property owned by the plaintiff and her husband, and disposing of it in an untraceable manner in violation of her legal right of possession and control, the Premier defendants, including Shear and Winberg acted unlawfully and maliciously with reckless disregard of her property rights, her personal attachment to the disposed of items, and her financial interests.

98.   By using stealth and deception to prevent plaintiff Conte from observing their obviously planned looting of her stored property, the defendants' actions constitute an evil-minded intent to steal plaintiff's property, warranting the award of punitive damages in addition to all of the statutory remedies.

WHEREFORE the plaintiffs demand Judgment against the defendants Premier, Shear and Winberg jointly and severally for:

A.   Compensatory Damages in such amount as shall be established at trial as representing the loss of their personal property, including memorabilia and things of utility and monetary value;

B.   Nominal Damages for such losses which are not capable of being quantified;

C.   Punitive damages; and

D.   Costs, interest and attorneys' fees.

### DESIGNATION OF TRIAL COUNSEL

In accordance with R.4:25-4, George T. Dougherty is hereby designated as trial counsel for the plaintiffs in the above matter.

### NOTICE TO THE ATTORNEY GENERAL

Pursuant to the provisions of N.J.S.A. 56:8-1 et seq. notice of the within action, and a copy of the complaint have been served upon the Attorney General of the State of New Jersey.

## CERTIFICATION PURSUANT TO R. 1:38

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

## DEMAND FOR DISCOVERY OF INSURANCE INFORMATION
## PURSUANT TO R. 4:10-2(b)

Pursuant to R. 4:10-2(b) demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment ( )YES ( )NO.

If the answer is "yes", attach a copy of each or in the alternative state, under oath or certification (a) number; (b) name and address of the insurer or issuer; (c) inception and expiration dates; (d) name and address of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; (g) medical payment limits; (h) name and address of person who has custody and possession thereof; (i) where and when each policy or agreement can be inspected and copied.

## NOTICE PURSUANT TO RULE 1:5-1A AND 4:17-4C

Please take notice that the undersigned hereby demands, pursuant to the above cited Rules of Court, that each party serve pleadings and Interrogatories and receiving Answers thereto serve copies of all such pleadings and answers to Interrogatories and all documents, paper and other material referred to herein, received from any party, upon the undersigned attorney and take notice that this is a continuing demand.

## CERTIFICATION OF NO ACTIONS PENDING

Pursuant to R.4:5-1, I hereby certify that to the best of my information, knowledge, and belief the matter in controversy is not the subject of any other action or arbitration proceeding and no other action or arbitration proceeding is contemplated. I also certify that to the best of my information, knowledge, and belief there are no other parties who should be joined in this action.

KATZ & DOUGHERTY, LLC
Attorneys for Plaintiffs

Dated: 10/9/20

By: _____
George T. Dougherty

# EXHIBIT A

# GreenSky®

For Billing Inquiries or Lost Inquiries to:
GreenSky® PO Box 29429, Atlanta, GA 30359

**GreenSky® Program Loan Account**
Statement for period ending 03/19/2018
Account Number: XXXX XXXX xxx 902

011684

*PD $350*
*3/26/18*

---

**Thank you for financing your purchase with Premierwaterproofig LLC**

---

## Payment Information

| | |
|---|---|
| New Balance..................................................$25,101.29 |
| **Minimum Payment Due...................................$101.29** |
| Payment Due Date................................04/14/2018 (before 6:00 pm ET) |
| **Purchase window expiration: 06/22/2018** |

To view account information, please log on to greenskyonline.com.

**Late Payment Warning:** If we do not receive your minimum payment by the Payment Due Date listed above, you may have to pay a late fee of up to the amount authorized by your loan agreement.  If your account is in dispute, your New Balance may reflect a temporary credit.

## Do you have questions about your account?

We are available to assist every Monday-Saturday from 6 AM-1 AM and on Sunday from 8 AM-1 AM, Eastern Time.

| | |
|---|---|
| Toll-Free Customer Service | 855-809-1889 |
| Your Support Team | service@greenskycredit.com |

Make payments, check your balance, and much more!
Visit our customer website at GreenSkyOnline.com.

## Summary of Account Activity

| | |
|---|---|
| Beginning Balance.................................................$0.00 |
| Payments...............................................................$0.00 |
| Other Credits²........................................................$0.00 |
| Purchases..................................................$25,000.00 |
| **Fees Charged.......................................................$0.00** |
| **Interest Charged...............................................$101.29** |
| New Balance...............................................$25,101.29 |

| | |
|---|---|
| Credit Limit...................................................$30,000.00 |
| Available Credit.............................................$5,000.00 |
| Statement Closing Date...................................03/19/2018 |
| Days in Billing Cycle......................................................25 |
| Annual Percentage Rate.............................................2.99% |

The Servicemembers Civil Relief Act (SCRA) provides important financial and legal protections to servicemembers, including caps on interest rates and stays of certain legal proceedings.  Learn more online at www.militaryonesource.mil (search for "SCRA").

---

## On your Promotion Expiration Date, 07/22/2018, a new monthly payment will be calculated for the remaining 139 months of your loan.

---

**When you use your GreenSky® Installment Loan, you have zero liability for transactions that you do not authorize***
**Log on to greenskyonline.com today to manage your account - it's fast, secure and easy.**

*Applicable payment card network rules apply.  Any unauthorized transactions must be reported to GreenSky within 60 days.

## TRANSACTIONS

| Reference Number | Transaction Date | Post Date | Description | Amount |
|---|---|---|---|---|
| **PAYMENTS AND CREDITS²** | | | | |
| **PURCHASES** | | | | |
| 4293664 | 03/05/2018 | 03/07/2018 | PP*PREMIERWATE | $10,000.00 |
| 4375151 | 03/09/2018 | 03/11/2018 | PP*PREMIERWATE | $5,000.00 |
| 4375152 | 03/09/2018 | 03/11/2018 | PP*PREMIERWATE | $10,000.00 |
| **FEES** | | | | |
| | | TOTAL FEES FOR THIS STATEMENT | | $0.00 |
| **INTEREST CHARGED** | | | | |
| GS54813 | 03/18/2018 | 03/19/2018 | Account Activation Fee | $39.00 |
| GS30870 | 03/19/2018 | 03/19/2018 | FINANCE CHARGE | $62.29 |
| | | TOTAL INTEREST CHARGED FOR THIS STATEMENT | | $101.29 |

---

Your Lender is SunTrust Bank, a Georgia banking corporation.
A payment in accordance with this Statement is a payment to your Lender.

²If your account is in dispute, your statement may reflect a temporary credit until your dispute is resolved.

Page 1 of 1     This statement is continued on the reverse side.

Program Agreement v. 5.3

## GreenSky® Merchant Program Agreement

This Agreement sets forth the terms between Merchant and Program Administrator relating to the GreenSky® Program. Capitalized words not otherwise defined herein have the meanings set forth in <u>Section 42</u> of this Agreement. By participating in the GreenSky® Program, Merchant accepts the terms of this Agreement as follows:

1.    **GreenSky® Program.**

Program Administrator is the administrator of the GreenSky® Program and, among other things, provides administrative, technical and ministerial services to Funding Participants. Merchant agrees to participate in the GreenSky® Program in accordance with the terms of this Agreement, including the Operating Instructions, to allow Merchant's customers to obtain Loans from a Funding Participant for purchases of eligible Offerings offered by Merchant, which Loans are funded by Funding Participants. Merchant understands that Program Administrator is committed to meeting or exceeding all regulatory requirements that are applicable to the GreenSky® Program and that Merchant plays an integral role in helping Program Administrator ensure compliance with all such requirements. Program Administrator enters into this Agreement under delegated authority in its role as Program Administrator for Funding Participants participating in the GreenSky® Program.

2.    **Overview of the Merchant's Obligations and Responsibilities under the GreenSky® Program.**

(a)    All of Merchant's obligations and responsibilities under the GreenSky® Program are detailed in this Agreement and the Operating Instructions, which are available on Program Administrator's website at https://www.greenskycredit.com/merchantagreement. These obligations and responsibilities include:

(i)    ensuring all employees or agents involved with the GreenSky® Program are advised of the requirements related to offering the GreenSky® Program to Merchant's customers and that Merchant's employees or agents having sales and finance responsibilities have completed the orientation and training related to the GreenSky® Program adopted by Funding Participants and provided by Program Administrator;

(ii)    promoting the GreenSky® Program in a legally-compliant, accurate, complete, unbiased and fair manner;

(iii)    ensuring that Loan proceeds are used only in connection with eligible Offerings;

(iv)    taking commercially reasonable measures to prevent fraudulent activity by an applicant, Borrower or Merchant (including any of its employees, agents or subcontractors) with respect to a Loan or Loan proceeds, including verifying the identification of each individual applying for a GreenSky® Program credit product or using an Access Device, Account Number or Loan proceeds at the time of a sale of Offerings and ensuring that there is no discrepancy between the documents Merchant relies on to fulfill its obligation to verify the identity of such individual under <u>Section 7(d)(iii)</u> and such individual's physical appearance or other application information;

(v)    cooperating with Program Administrator in investigating and remediating escalations, complaints and disputes about Merchant and responding within five Business Days, or such shorter time as required by this Agreement, to any request for information, audit or review related to Merchant's participation in the GreenSky® Program;

(vi)    limiting Merchant's discussions with each Borrower and prospective Borrower regarding the GreenSky® Program to providing such Borrower or prospective Borrower with approved materials or expressly authorized information, such as the telephone number to contact Program Administrator, acting on behalf of Funding Participants, regarding the GreenSky® Program, Program Administrator's address and certain applicable codes or other identification numbers, and conducting such discussions in English or Spanish only, provided that if Merchant conducts such discussions in Spanish, Merchant will request or direct each Borrower or prospective Borrower to request a Spanish-language copy of the loan documents, and provided further that if such Borrower or prospective Borrower wishes to use a translator during discussion of the GreenSky® Program, Merchant will only speak to the translator in English or Spanish and will verify and document the identification of each individual serving as a translator;

(vii)    maintaining any information Merchant receives regarding each Borrower or prospective Borrower (in such capacities) or a Loan as strictly confidential;

(viii)    providing to Program Administrator in a timely manner all information relating to Merchant's participation in the GreenSky® Program and any Borrower and prospective Borrower as set forth herein and otherwise requested by Program Administrator or a Funding Participant (it being understood that Program Administrator and Funding Participants may share any such information with the sponsor referring the Merchant and the sponsor's Affiliates);

© 2018 GREENSKY, LLC ALL RIGHTS RESERVED.

(ix)    responding within five Business Days, or such shorter time as required by this Agreement, to any inquiry from Program Administrator, and fully cooperating with Program Administrator in connection with the resolution of any dispute involving a Borrower or prospective Borrower;

(x)    with respect to any documents or forms provided to, or to be executed by, a Borrower or prospective Borrower or which constitute a disclosure required by Program Administrator or under applicable law in connection with the GreenSky® Program, only using such documents and forms provided to Merchant, or approved in writing by, Program Administrator (and only using the latest version thereof) and not modifying any such documents or forms without Program Administrator's prior written consent; and

(xi)    if offering a secured solar loan plan to a prospective Borrower, only offering such plan to finance a solar system and not for any other Offering or purpose.

(b)    In addition to Merchant's other obligations and responsibilities, Merchant shall not:

(i)    prepare or disseminate any written materials regarding the GreenSky® Program other than those provided or approved in writing by Program Administrator acting on behalf of Funding Participants;

(ii)    discuss with a prospective Borrower the likelihood of his or her approval for a Loan;

(iii)    provide any misleading, confusing or incomplete information regarding the GreenSky® Program, including applicable interest rates or any terms or conditions of a Loan under the GreenSky® Program;

(iv)    obtain any credit reports on prospective Borrowers or Borrowers;

(v)    pursuant to Section 5(b), add any fees to prices charged to Borrowers for the application for or use of a Loan;

(vi)    discriminate among prospective Borrowers or Borrowers in any unlawful way;

(vii)    ask for or accept any document from a Borrower that includes a statement that the home improvement project on which Merchant is working on behalf of such Borrower has been completed to such Borrower's satisfaction in advance of the actual completion thereof; or

(viii)    engage any subcontractor to work on a home improvement project funded in whole or in part by a Loan that is not properly licensed.

(c)    In the event that Program Administrator or a Funding Participant believes Merchant has failed to comply with this Agreement, Program Administrator may suspend Merchant's participation in the GreenSky® Program and take such other action as it deems appropriate, including terminating this Agreement.

3.    **Overview of Program Administrator's Obligations and Responsibilities under the GreenSky® Program.**

Program Administrator, acting on behalf of Funding Participants, will administer the GreenSky® Program.  A Funding Participant may offer Merchant's qualified customers open-ended (revolving) or closed-ended (installment) Loans for the purpose of financing purchases of eligible Offerings offered by Merchant.  Funding Participants will direct the terms and conditions under which Loans are extended to Borrower(s).

4.    **Modification.**

Except as provided in Section 9, Program Administrator, acting on behalf of Funding Participants, may modify this Agreement by providing written or electronic notice to Merchant.  Merchant's continued participation in the GreenSky® Program for new credit applications after the effective date of any such modification will constitute Merchant's acceptance of the modified terms and Merchant's agreement to be bound by them.  If Merchant does not want to accept such modifications, it must not submit any credit applications subsequent to such effective date and must advise Program Administrator in writing of its decision.  Notwithstanding the foregoing, modifications to this Agreement that are applicable only to Merchant and not to other participants in the GreenSky® Program shall not be effective unless provided to Merchant in writing and agreed to by Merchant, either in writing or by its continued participation in the GreenSky® Program.

5.    **Promotion of the GreenSky® Program.**

(a)    If Merchant chooses to participate in the GreenSky® Program, Merchant agrees to promote the GreenSky® Program in a commercially reasonable manner and in full compliance with all applicable laws and regulations.  Any written material referring or

relating to the GreenSky® Program, including the fact that Merchant participates in the GreenSky® Program or specific Loan credit terms or credit products Merchant accepts, shall be prepared or furnished by Program Administrator or, if prepared by Merchant, shall be subject to review and approval by Program Administrator in advance of being used by Merchant.  Any such review and approval shall be limited to the review and approval of GreenSky® Program-specific representations and statements and shall not be construed as a review or approval of any advertising or solicitation materials for any other purpose or for compliance with any other provisions of any local, state or federal laws not related to the GreenSky® Program.

(b)      Merchant shall not require, through a surcharge, an increase in price or otherwise, any Borrower to pay any fees as a consequence of Borrower applying for or using his or her Loan to pay Merchant.  Specifically, Merchant may not charge the Borrower any part of any charge or fee imposed by the GreenSky® Program on Merchant, provided that Merchant may treat such fees as overhead to be distributed across all customers regardless of whether the customer uses a Loan to pay for his or her purchase from Merchant.

(c)      During the term of this Agreement, Merchant shall not issue, or arrange to issue, to prospective Borrowers any other third-party financing programs.

(d)      Merchant shall not use a Loan as a "bridge" loan or intend for the Borrower to use the proceeds of another loan to pay off a Loan under the GreenSky® Program.

6.      **Loan Terms and Approval.**

(a)      Through the GreenSky® Program, a Funding Participant may offer Loan(s) to Merchant's qualified customers under a separate Loan Agreement between Funding Participant and such qualified customer.  As between the parties, Program Administrator, at the direction and under the control of Funding Participants, (i) has sole authority to prescribe the terms and conditions of the credit application, the Loan Agreement and each Loan (including interest rate, maximum amount and term), (ii) may prospectively modify such terms and conditions with respect to Loans for which approval is granted subsequent to the time of the modification, (iii) may at any time change the credit standards without notice to Merchant, and (iv) may reject and accept credit applications in its sole discretion.  A Funding Participant shall not be obligated to take any action with respect to a Loan, including accepting the credit application or making future credit available to a prospective Borrower or a Borrower, and has no obligation to approve any particular Loan or to approve Loans meeting any particular set of requirements.  A Funding Participant may withdraw any previously issued Loan approval prior to funding of the Loan, which Loan approvals, unless earlier withdrawn, shall automatically expire at the end of the purchase window for the applicable credit product.  Funding Participants may at any time suspend, and restart, any of the Loan products offered in connection with the GreenSky® Program.

(b)      Except as provided herein, Funding Participants shall own the Loans and shall bear the credit risk for the Loans.  Merchant acknowledges and agrees that it shall have no ownership interest in the Loans.

7.      **Applications.**

(a)      Merchant agrees to submit all credit applications in accordance with this Agreement and the Operating Instructions.  Merchant will use only a credit application form provided or approved by Funding Participants for use in the GreenSky® Program and will not use any other third-party financing provider's credit application in connection with the GreenSky® Program.

(b)      Merchant agrees to provide its sales and finance employees with the necessary equipment to submit credit applications to the GreenSky® Program in accordance with this Agreement and the Operating Instructions.

(c)      In addition, Merchant may, with a prospective Borrower's prior written consent, (i) submit a completed credit application to the GreenSky® Program by such means as are set forth in the Operating Instructions and (ii) receive and forward the Loan Documents to the prospective Borrower.

(d)      Merchant shall with respect to each credit application or application information form:

(i)      ensure all information requested on such credit application is complete and legible;

(ii)      obtain all signature(s) or e-signature(s), as applicable, on such credit application;

(iii)      verify the identification of each individual applying for credit by obtaining a government-issued photo identification document and Social Security number (or another identification method authorized in the Operating Instructions); and

(iv)      provide all other information requested or required by the GreenSky® Program.

(e)      In the event Merchant identifies a discrepancy between the documents Merchant relies on to fulfill its obligation under Section 7(d)(iii) and the prospective Borrower's physical appearance or other application information, Merchant shall not submit a credit application to the GreenSky® Program from any such applicant and shall promptly inform Program Administrator.

(f)      In the event that Program Administrator provides Merchant with an Internet address to process credit applications, it will be an address on a commercial site on the World Wide Web portion of the Internet accessible by Merchant. As between the parties, Program Administrator shall own, manage and maintain such Internet site and retains all right, title and interest in and to such Internet site, and Merchant's only right to such Internet site is to use it in connection with its participation in the GreenSky® Program.

(g)      Merchant acknowledges and agrees that "restricted transactions," as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued thereunder, and all other transactions in the nature of gambling ("Restricted Transactions") are prohibited from being processed through the GreenSky® Program. Merchant agrees that it will not submit Restricted Transactions for processing through the GreenSky® Program. In the event Program Administrator identifies a suspected Restricted Transaction, Program Administrator may, on behalf of Funding Participants, block or otherwise prevent or prohibit such transaction and seek any other remedies available under this Agreement or otherwise.

8.      **Eligible Sales Transactions.**

Once a Loan is approved by a Funding Participant:

(a)      Borrower must present a valid Access Device or Account Number at the time of sale using proceeds from Borrower's Loan. Merchant agrees to honor all valid Access Devices and Account Numbers when properly presented as payment for eligible Offerings. Merchant must verify the identification of each individual presenting a valid Access Device or Account Number at the time of sale by obtaining a government-issued photo identification document.  In the event Merchant identifies, or reasonably should identify, a discrepancy between the Borrower's identification documents used to fulfill Merchant's obligations under this subsection and Borrower's physical appearance or Access Device or Account Number, Merchant shall not submit a transaction to the GreenSky® Program from any such Borrower and shall promptly inform Program Administrator.

(b)      Merchant must obtain a transaction authorization through the applicable payment card network or the GreenSky® Program's authorization center, as and to the extent directed by Program Administrator; provided, however, in order to be eligible to process transactions through the GreenSky® Program's authorization center, Merchant must satisfy the relevant qualifications therefor and comply with the applicable policies and procedures related thereto, as established from time to time by Program Administrator (which policies and procedures with respect to Merchant may, in the discretion of Program Administrator, include net settlement of amounts owed between Merchant and Program Administrator or Funding Participants).  Program Administrator, on behalf of Funding Participants, in its sole discretion, may grant, deny or revoke any transaction authorization and may restrict or condition payment to Merchant in respect of any Borrower. Unless the Operating Instructions provide otherwise, transaction authorizations are valid for the time period established by the applicable payment card network (but not more than five days).  Any transaction that is presented to Program Administrator after such time may be declined. If a transaction authorization is granted, Merchant shall submit a Transaction Request to Program Administrator through the applicable payment card network or directly to the GreenSky® Program's authorization center, and the Loan will be funded by a Funding Participant. Neither Program Administrator nor such Funding Participant shall be responsible, however, for any delay in funding a Loan caused by a merchant processor or otherwise. If a transaction authorization is denied, Merchant shall not complete the transaction for which authorization was sought and will contact the GreenSky® Program's authorization center as requested.

(c)      All transactions shall be evidenced by a Transaction Request.  Merchant shall complete the Transaction Request in accordance with this Agreement. Merchant shall not process a transaction where the amount of the Transaction Request exceeds the account limit established by the GreenSky® Program and any other cash or other payment agreed to by the Borrower.

(d)      Merchant agrees not to divide a single transaction (or project) between two or more Transaction Requests (for one or more Borrowers) or between a Transaction Request and a sales or credit slip from another credit provider; provided, however, that Merchant may divide a single transaction between a Transaction Request and a sales or credit slip from another credit provider when an approved Loan amount is insufficient to pay Borrower's total transaction amount and Program Administrator has been provided written notice of such total transaction amount.

(e)      With respect to each transaction, Merchant agrees to:

(i)      submit such transaction for authorization only after confirming that the Borrower has received and agreed to the Loan Documents;

(ii)      enter legibly on the Transaction Request sufficient information to identify the Borrower and Merchant, including Merchant's identification number, the Borrower's Account Number, the expiration date of the Access Device and the amount and date

of the transaction (and, by submitting the transaction, Merchant warrants the Borrower's true identity as an authorized user of the Access Device);

(iii)    create and retain accurate records relating to such transaction that include a description of all Offerings purchased in detail sufficient to identify the date of such transaction and the entire amount due for such transaction, including any applicable taxes (the "Invoice");

(iv)    deliver a true and completed copy of the Invoice to the Borrower at the earlier of processing such transaction or the delivery of (or performance with respect to) the Offerings;

(v)    obtain the signature of the Borrower on the Invoice or other evidence of the Borrower's authorization of such transaction and compare the signature with the signature panel of the Access Device or the Borrower's government-issued photo identification document (or as otherwise permitted in the Operating Instructions) and, if the identification is uncertain or if the Merchant otherwise questions the validity of the Access Device, contact the GreenSky® Program authorization center for instructions;

(vi)    enter such transaction into Merchant's point-of-sale terminal or other applicable device; and

(vii)    present the Transaction Request to Program Administrator for authorization only upon Borrower's express written approval, provided that if such transaction is canceled or if the Offerings are canceled or returned, such Transaction Request shall be subject to chargeback or refund, and Merchant agrees that the submission of such transaction for authorization shall constitute a representation by Merchant that there is a valid Invoice for such transaction that complies with the terms of this Agreement.

(f)    All transactions financed pursuant to this Agreement shall be for personal, family or household purposes unless otherwise authorized in writing by Program Administrator.

(g)    Offerings purchased by a Borrower that are being shipped or delivered must be shipped or delivered to a Borrower's residence unless shipment or delivery to another location is authorized by such Borrower in writing and approved in writing by the Relevant Funding Participant, as communicated by Program Administrator.

(h)    Subject to applicable law, Merchant may process deposits for (A) up to the lesser of 20% of (1) the aggregate project amount and (2) the Borrower's credit limit for such Loan or (B) such greater amount as the Relevant Funding Participant, as communicated by Program Administrator, may approve in writing.  Merchant may not otherwise process deposits through the GreenSky® Program.

(i)    Merchant agrees that it will not offer extended product or service warranties and service agreements underwritten by Merchant, an Affiliate of Merchant or any third party in conjunction with purchases made by Borrowers without the prior written approval of the Relevant Funding Participant, as communicated by Program Administrator, of any such warranty or service agreement.  Merchant agrees that all such extended warranties and service agreements will comply with applicable law.  Merchant agrees that it will comply with all obligations under any such extended warranty or service agreement, whether underwritten by Merchant, an Affiliate or a third party.

9.    **Fees.**

For each funded Loan, in addition to any fee imposed by the applicable payment card network for processing the transaction (which may include a fee imposed by Program Administrator for transactions processed directly through Program Administrator's payment network), Merchant will pay Program Administrator  a contractor or service fee ("Transaction Fee") in return for access to the GreenSky® Program, including access to the GreenSky® Program technology platform to allow Merchant's customers to obtain Loans from Funding Participants. The initial schedule of Transaction Fees applicable to Merchant is attached as Schedule A to this Agreement and incorporated herein by reference. The Transaction Fee is due and payable to Program Administrator upon the funding of a Loan. Merchant shall also pay Program Administrator a fee each month to participate in the GreenSky® Program in accordance with Schedule A (unless the aggregate volume of Loan fundings for Borrowers in a particular month satisfies the minimum level specified in Schedule A).  In the event that Merchant does not pay the Transaction Fee or any other fees when due, Program Administrator will be entitled to immediately suspend Merchant's participation in the GreenSky® Program, and, in addition to all other rights and remedies under this Agreement, Program Administrator may, on behalf of itself and Funding Participants, assess Merchant such additional charges (such as late payment or returned payment charges) as set forth in Schedule A.  In addition, if Program Administrator, in its sole discretion, determines that Merchant has offered the GreenSky® Program as "second-look" financing to any of its customers, then Program Administrator, in its sole discretion, may increase the Transaction Fee by an additional 5 percentage points for all Loan transactions effective upon written notice to Merchant. Program Administrator may also assess Merchant charges related to customer disputes with respect to which Program Administrator determines Merchant is at fault, as well as charges related to chargebacks and refunds, in each case as set forth in Schedule A.  Notwithstanding the provisions of Section 4 of this Agreement, by written notice to Merchant, Program Administrator from time to time may modify the Transaction Fee and the other fees and charges set forth in Schedule A, which modifications shall apply to all Loans approved on or after the effective date specified in such notice (or, if no effective date is specified, the first day of the month after which such notice is provided).

10.     **Customer Payments.**

Merchant agrees that Program Administrator, on behalf of, and at the direction and under the control of, Funding Participants, has the sole right to receive payments on Loans. Merchant agrees not to attempt to collect a Loan unless specifically authorized in writing by the Relevant Funding Participant, as communicated by Program Administrator. Merchant agrees to hold in trust for the Relevant Funding Participant any payment received by Merchant in respect of such Loan and to deliver such payment to Program Administrator, acting on behalf of the Relevant Funding Participant, together with the Borrower's name, Account Number, and any correspondence accompanying the payment, within five days of receipt by Merchant. Merchant agrees that Merchant shall be deemed to have endorsed, in favor of the Relevant Funding Participant to which any such payment relates, any Borrower payment by check, money order or other instrument made payable to Merchant that a Borrower presents to Program Administrator, and Merchant hereby authorizes Program Administrator, on behalf of the Relevant Funding Participant, to supply such necessary endorsements on behalf of Merchant. Merchant agrees that it shall not, directly or indirectly, make any payment on a Loan on behalf of a Borrower without the prior written approval of Program Administrator, acting on behalf of Funding Participants, and Program Administrator, in its sole discretion, shall have the right to immediately (a) suspend Merchant's right to submit new funding transactions on approved Loans or submit new credit applications or (b) terminate this Agreement in the event that Merchant fails to comply with this provision.

11.     **Representations and Warranties.**

(a)     As to each credit application, Transaction Request or other material presented or delivered in connection with the GreenSky® Program, and the transaction it evidences, Merchant represents and warrants the following: (i) that Merchant has verified the identity of the customer and that the customer was of legal age and competent to execute the credit application, Loan Agreement and transaction authorization at the time of the execution thereof; (ii) that the credit application, Loan Agreement and Transaction Request are bona fide and were actually made and agreed to by each person identified as an applicant or Borrower; (iii) that each Loan Agreement and Transaction Request (A) will arise out of a bona fide sale of Offerings by Merchant and the express consent of Borrower, (B) will not involve the use of the Loan for any purpose other than for the purchase of the Offerings that are the subject of the Loan Agreement and Transaction Request, which are truly and accurately described therein, are fit and merchantable for their intended purpose, have been delivered into the possession of the Borrower and any services so described have been performed, and that all installation (if applicable) has been completed in a proper and workmanlike manner to the Borrower's complete satisfaction, and (C) represents Merchant's satisfactory performance of all of its other obligations to the Borrower in connection with the transaction evidenced by such Transaction Request; (iii) that Merchant has conveyed full and complete title to the Offerings, if any, to the Borrower; (iv) that such transaction is, in all respects, in compliance with the Operating Instructions, this Agreement, and all laws, rules and regulations of any federal, state or local governmental agency governing the same; (v) that Merchant has no knowledge or notice of any fact, event, issue or circumstance that would impair enforceability or collection of the Loan as against Borrower; (vi) that there are no liens, mortgages, encumbrances or security interests upon the Transaction Request or the rights evidenced by the Transaction Request; (vii) that there are no present or future unvested or unrecorded rights related to such transaction that could give rise to a mechanic's, materialman's or laborer's lien, except to the extent those rights are in favor of Merchant, in which event Merchant agrees not to assert those rights to the detriment of any Funding Participant; (viii) that Borrower has no claim or defense to payment of any amount reflected on such Transaction Request based upon materials or workmanship or any act or omission of Merchant or Merchant's employees, contractors, laborers or representatives; (ix) that there have been no representations or warranties made to Borrower other than warranties approved by the Relevant Funding Participant, as communicated by Program Administrator, or a third party's or manufacturer's standard warranties, and in the event a manufacturer or third party breaches a standard warranty, Merchant will cure such breach within 30 days of notice thereof; (x) that Merchant has not increased the purchase price or added any additional fees as a result of Borrower's use of the Loan to purchase the Offerings; and (xi) that Merchant has not taken any adverse action against a prospective Borrower or Borrower because the prospective Borrower or Borrower is a member of a protected class, as defined by applicable law, or because the prospective Borrower or Borrower has chosen to use credit to finance the purchase, nor has Merchant engaged in any practice that has or could have an impermissible negative or disparate impact on members of any protected class, including steering prospective Borrowers or Borrowers to more expensive or less favorable financing options because of the prospective Borrowers' or Borrowers' membership in a protected class.

(b)     Merchant represents and warrants that (i) Merchant is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to carry on its business as presently conducted and is duly qualified or licensed to do business and is in good standing (where such concept is recognized under applicable law) in each jurisdiction where the nature of its business or the ownership or operation of its properties makes such qualification or licensing necessary, (ii) Merchant has all requisite power and authority to execute and deliver, and perform its obligations under, this Agreement and to consummate the transactions contemplated hereby, (iii) the execution, delivery and performance of this Agreement by Merchant and the consummation by Merchant of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Merchant and do not contravene any government or contractual restriction applicable to Merchant, and (iv) this Agreement has been duly executed and delivered by Merchant and, assuming the due authorization, execution and delivery by Program Administrator, constitutes a legal, valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms.

Program Agreement v. 5.3

(c)     **If Merchant offers products or services to any consumer located in New Jersey**, Merchant represents and warrants that Merchant will comply with the New Jersey Consumer Fraud Act (N.J.S.A. 56: 8-1, *et seq.*), the New Jersey Contractors' Registration Act (N.J.S.A. 56:8-136 *et seq.*), the New Jersey Contractor Registration Regulations (N.J.A.C. 13:45A-17.1 *et seq.*) and the New Jersey Home Improvement Regulations (N.J.A.C. 13:45A-16.1 *et seq.*).  In the event Program Administrator learns that Merchant has failed to comply with this Section 11(c), Program Administrator will terminate this Agreement and may seek any other remedies available under this Agreement or otherwise.

(d)     Merchant represents and warrants that it is in compliance with, and will continue to comply with, all applicable laws, rules and regulations, including those relating to privacy and data security and to its sale of Offerings, point-of-sale practices and representations made by Merchant's employees and representatives and that Merchant has retained and will retain all required licenses, permits, approvals, certifications and the like that are required under applicable law to conduct its business, to deliver Offerings, to participate in the GreenSky® Program and to perform its obligations under this Agreement, each of which remains and shall remain in full force and effect.  Merchant represents and warrants that it will comply with the Merchant Program Agreement Compliance Addendum attached hereto.

(e)     Merchant represents and warrants that it will not violate any agreement it has with third parties and will advise Program Administrator promptly of any event that may adversely affect its prospects or continued operations.

12.     **Chargebacks and Refunds.**

(a)     Without duplication of any amounts paid by Merchant pursuant to Section 25(b), Merchant agrees that it will refund on demand, and Program Administrator, at the direction and under the control of Funding Participants, may charge back against Merchant, the amount of any Loan affected, plus any finance or other charges related to the Loan under the Borrower's Loan Agreement, in each of the following events:

(i)     Program Administrator or the Relevant Funding Participant determines that (A) Merchant has breached or failed to fulfill any of its obligations under this Agreement, including the Operating Instructions, or has breached any of its representations or warranties under this Agreement, or (B) the Invoice or Transaction Request or the transaction to which such Invoice or Transaction Request relates, credit application or sale of Offerings is fraudulent or is subject to any claim of illegality, cancellation, rescission, avoidance or offset, including negligence, fraud, misrepresentation or dishonesty on the part of the Borrower or Merchant, its agents, employees, representatives or franchisees;

(ii)     the Borrower disputes or denies the transaction, the execution of the transaction authorization, credit application or Loan Agreement, or the delivery, quality, or performance of the Offerings purchased or any warranties thereto, or the Borrower has not authorized the transaction, or alleges that a credit adjustment to which Borrower was entitled was requested and refused by Merchant or that a credit adjustment was issued by Merchant but not posted to the Loan due to Merchant's failure to submit the credit adjustment to the GreenSky® Program; or

(iii)     Borrower asserts any claim or defense against Program Administrator or the Relevant Funding Participant as a result of any act or omission of Merchant in violation of any applicable law (other than those that relate solely to the terms and conditions of such Loan).

(b)     With respect to any chargeback or refund:

(i)     Purchases of Offerings made by Borrowers utilizing Access Devices or Account Numbers issued as part of the GreenSky® Program, and processed by a payment card network, will be processed by the applicable payment card network and, to the extent applicable, all related chargebacks will be processed in accordance with the applicable payment card network procedures.

(ii)     Chargebacks for purchases of Offerings made by Borrowers not processed by the applicable payment card network, if any, or when payment card network's process otherwise is not available, will be paid by Merchant in a manner as consistent as practicable with the original funds transfer.

(iii)     In its reasonable discretion but upon prior notice to Merchant, the Relevant Funding Participant, as communicated by Program Administrator, may compromise and settle any claim made by any Borrower if such claim may give the Relevant Funding Participant a right to chargeback (or a right to a refund) in accordance with this Agreement.  The Relevant Funding Participant, as communicated by Program Administrator, may settle such claim in an amount equal to the amount paid for the disputed Offerings, not to exceed the face amount of any Transaction Request.

(iv)     If a Funding Participant exercises its right of chargeback (or seeks a refund) in accordance with this Agreement, such Funding Participant may set off or recoup amounts charged-back or subject to refund against any sums due to Merchant under this Agreement and, if the amount of such chargeback or refund exceeds the sums due Merchant, such Funding Participant may demand

payment from Merchant for such amount (or set off or recoup such amount up to the amount of sums due to Merchant and demand payment from Merchant for such excess amount).

(v)     If the full amount due with respect to any Loan is charged back or otherwise refunded by Merchant, Merchant shall be entitled to recover the unpaid amount of the Transaction Request from the customer as if the financing had not occurred, although Merchant shall have no rights under the Loan Agreement or to the proceeds of the Loan.  In such event, Merchant shall bear all liability and risk of loss associated with such Transaction Request without warranty by, or recourse or liability to, Program Administrator or any Funding Participant.

(vi)    Program Administrator shall promptly notify Merchant of all requests by Borrowers for a chargeback or refund. Merchant is required to address any dispute or other circumstance described in Section 12(a) to the reasonable satisfaction of the Relevant Funding Participant and to Program Administrator, on behalf of the Relevant Funding Participant, within 15 Business Days of notice of any such chargeback or refund.

(vii)   Where a chargeback or refund occurs within 30 days following initial funding and Program Administrator determines that such chargeback or refund was not due in any way to Merchant's bad faith, Program Administrator will refund to Merchant the amount of the Transaction Fee paid with respect to the relevant portion of the Loan to which such chargeback or refund relates. Otherwise, GreenSky will have no obligation to refund any Transaction Fees.  In addition, Merchant's entitlement to receive a refund of fees imposed by the applicable payment card network will be governed by the applicable rules thereof, and Program Administrator and Funding Participants shall have no obligation with respect thereto.

13.     **Authorization for Automatic Direct Deposits (ACH Credits) and Direct Debits (ACH Debits).**

(a)     Merchant authorizes Program Administrator, on behalf of itself and Funding Participants (as applicable), to initiate credit entries for amounts that Program Administrator or Funding Participants may owe Merchant or that may otherwise be due Merchant under this Agreement.  Merchant authorizes Program Administrator to initiate debit entries for (i) any credit entries in error, (ii) Transaction Fees or (iii) the amount which Merchant owes under this Agreement, including Transaction Fees, which is more than the amount owed Merchant.  Such credit and debit entries will be to the bank account identified by Merchant.  Merchant and Program Administrator acknowledge that the origination of ACH transactions described in this Section 13 must comply with applicable law and NACHA rules.

(b)     The authorizations set forth in Section 13(a) will remain in effect until the date on which no Loans remain outstanding. Merchant must notify Program Administrator within three Business Days of any change to the bank account for such ACH credits and ACH debits.  Program Administrator agrees to comply with written notifications from Merchant that alter Merchant's bank account information (i.e., name and address of the bank or financial institution, transit/routing number or account number), provided that Program Administrator receives such notification in sufficient time and manner to give Program Administrator and the bank or financial institution reasonable opportunity to act on it.

14.     **Records.**

(a)     All data transmitted shall be in a medium, form and format designated by Program Administrator under the GreenSky® Program.  Any errors in such data or in its transmission by Merchant shall be the responsibility of Merchant, and any errors in such data or in its transmission by Program Administrator shall be the responsibility of Program Administrator.  Electronic transmission shall be the exclusive means utilized by Merchant for the transmission of transaction data to the GreenSky® Program except to the extent otherwise provided by Program Administrator.

(b)     Merchant shall maintain paper copies (when used) or copies of electronic images of the credit applications, Transaction Requests and Invoices and other records pertaining to any Loan or transaction covered by this Agreement for such time and in such manner as Program Administrator, at the direction and under the control of Funding Participants, or any law or regulation may require, but in no event less than seven years from the date of the credit application or Transaction Request.  Within 10 days, or such earlier time as may be required by Program Administrator, of receipt of Program Administrator's request, Merchant shall provide to Program Administrator the credit application, Transaction Request, Invoice or other transaction records, including evidence of an applicant's or Borrower's express consent to a credit application or transaction, and any other documentary evidence available to Merchant and reasonably requested by Program Administrator (i) to meet its obligations under applicable law or otherwise to respond to questions, complaints, lawsuits, counterclaims or claims concerning Loans or requests from Borrowers or regulatory authorities, (ii) to provide any information in connection with Program Administrator's pursuit, at the direction and under the control of Funding Participants, of bad debt tax refunds, deductions, credits, or audit offsets (including providing copies of Merchant's state sales and use tax returns), (iii) to ensure Merchant's compliance with this Agreement, or (iv) to enforce any rights a Funding Participant or Program Administrator may have against Merchant or a Borrower, including litigation by or against Program Administrator or such Funding Participant, collection efforts and bankruptcy proceedings, or for any other reason.

(c)      Merchant agrees to permit Program Administrator, at the direction and under the control of Funding Participants, to examine, upon reasonable notice, Merchant's books and records concerning Merchant's participation in the GreenSky® Program or any credit application or transaction giving rise to any Transaction Request or Loan and to provide Program Administrator, at the direction and under the control of Funding Participants, with such further information as may reasonably be required concerning Merchant's participation in the GreenSky® Program or any credit application or transaction. Merchant authorizes Program Administrator, at the direction and under the control of Funding Participants, to obtain credit reports with respect to Merchant and, to the extent permitted by law, to obtain credit reports individually with respect to all principals, partners or owners of Merchant, for the purpose of qualifying Merchant's business for participation in the GreenSky® Program and for evaluating Merchant's business for continued participation in the GreenSky® Program. Merchant agrees that it is authorizing Program Administrator to obtain credit reports and instructing any consumer reporting agency to provide such report now and in the future for the purpose of evaluating Merchant's business for future retention and participation in the GreenSky® Program. Merchant also agrees that, upon request, Merchant shall provide a copy of Merchant's most recent financial statements, including Merchant's balance sheets, statements of income and retained earnings, cash flows and any accompanying notes, in reasonable detail and prepared in accordance with generally accepted accounting principles.

(d)      Merchant will provide Program Administrator with all original or electronically reproducible copies of documents required to be retained under this Agreement upon request within five Business Days, or such shorter time as required by this Agreement.

15.      **Operating Instructions.**

(a)      Merchant shall satisfy all other requirements designated in any Operating Instructions or as otherwise may be required from time to time by Program Administrator, acting on behalf of Funding Participants, and communicated to Merchant. The terms of the Operating Instructions are incorporated by reference into this Agreement. In the event there is any inconsistency between any Operating Instructions and this Agreement, this Agreement shall govern.

(b)      Notwithstanding the provisions regarding notice in Section 32, Merchant agrees that Program Administrator may post the Operating Instructions on the GreenSky® Program website and that doing so will constitute notice thereof to Merchant. Merchant agrees that it has an ongoing obligation to check the website on a monthly basis for any updates or changes to the Operating Instructions.

16.      **Information Security.**

(a)      Merchant shall not disclose, and shall take all commercially reasonable measures to protect, Borrower Information, including any nonpublic personal information (as defined in the Gramm-Leach-Bliley Act, its implementing regulations, and other similar laws and regulations), to (i) any third party or (ii) any employee, officer, shareholder, member, partner, director, manager or representative of Merchant who is not engaged in the implementation and execution of the GreenSky® Program and having a need to know such information for Merchant to perform its obligations and responsibilities under this Agreement. Merchant shall not retain in any format, electronic or otherwise, any Borrower Information beyond what is required pursuant to this Agreement. Without by implication limiting the foregoing, if Merchant allows individuals to submit personal identifying information via the Internet, Merchant shall adopt and maintain a comprehensive privacy policy with respect to its handling of such personal information and Merchant's privacy policy shall be available on Merchant's Internet web sites.

(b)      Merchant shall keep confidential and not disclose to any person (except to employees, officers, shareholders, members, partners, directors, managers or representatives of Merchant who are engaged in the implementation and execution of the GreenSky® Program) all information, software, systems and data that Merchant receives from Program Administrator or from any other source relating to the GreenSky® Program and matters that are subject to the terms of this Agreement and shall use, and cause to be used, such information solely for the purposes of the performance of Merchant's obligations under the terms of this Agreement.

(c)      Program Administrator will keep confidential and not disclose to any person (except Funding Participants or the employees, officers, shareholders, members, partners, directors, managers, agents or representatives of Program Administrator, its subsidiaries, Affiliates or its designees who are engaged in the implementation and execution of the GreenSky® Program) any information that Program Administrator receives from Merchant that is designated confidential by Merchant. However, nothing in this Agreement shall limit Program Administrator's or Funding Participants' rights to (i) report information regarding Borrowers to consumer and commercial credit reporting agencies and credit bureaus to the extent permitted by the Loan Documents and other agreements with the Borrower or by applicable law, (ii) share Borrower Information with third-party service providers in the ordinary course of business for the purposes of administering the GreenSky® Program, (iii) disclose Borrower Information or any segment thereof to actual and potential third-party lenders that are bound by customary confidentiality obligations with respect to such data, or (iv) in the event a Loan or any part thereof is sold or assigned, disclose any information reasonably necessary or required to effectuate such sale or assignment.

(d)      Merchant and, on behalf of Funding Participants, Program Administrator each agrees that it has developed, implemented and will maintain at all relevant times contemplated by this Agreement effective information security policies and procedures that include administrative, technical and physical safeguards designed to (i) ensure the security and confidentiality of Borrower Information, (ii) protect against anticipated threats or hazards to the security or integrity of Borrower Information, (iii) protect against unauthorized access or use of Borrower Information, and (iv) ensure the proper disposal of Borrower Information. All personnel handling Borrower

9

Information shall be appropriately trained in the implementation of such information security policies and procedures. Each party shall regularly audit and review its information security policies and procedures and systems to ensure their continued effectiveness and determine whether adjustments are necessary in light of circumstances, including changes in technology, customer information systems or threats or hazards to Borrower Information.

(e)    Merchant shall promptly notify Program Administrator of any unauthorized access to Borrower Information or any breach in security measures or systems for the protection of Borrower Information and take appropriate action to prevent further unauthorized access or cure such breach. Merchant shall cooperate with Program Administrator with respect to its investigation or inquiry as to any such unauthorized access or breach, provide any notices regarding such unauthorized access or breach to appropriate law enforcement agencies and government regulatory authorities, affected applicants, Borrowers and customers as Program Administrator, at the direction and under the control of the Funding Participants, in its sole discretion, deems appropriate, and pay all expenses related thereto.

(f)    Merchant agrees that Program Administrator, at the direction and under the control of Funding Participants, may at any time upon notice to Merchant, review and audit Merchant's information security policies, procedures and systems to verify their adequacy for protection of Borrower Information. Merchant will correct promptly any weakness in such policies, procedures or systems identified by Program Administrator in its reviews thereof.

17.    **Borrower Complaints.**

Within five Business Days of receipt, Merchant shall provide Program Administrator, acting on behalf of, and at the direction and under the control of, the Relevant Funding Participant for the Loan to which such complaint relates, with a copy of any written complaint or a report of any verbal complaint received from any Borrower or any third party, including any regulatory authority. Merchant agrees it will cooperate with Program Administrator, acting on behalf of, and at the direction and under the control of, the Relevant Funding Participant, in responding to complaints, which cooperation may include providing documents evidencing applicant or Borrower authorization to submit a credit application or transaction.

18.    **Term, Suspension and Termination.**

(a)    This Agreement shall be effective on the date of Program Administrator's notice of Merchant's approval to participate in the GreenSky® Program and shall remain effective until either party gives the other party written notice of its decision to terminate this Agreement. The termination of this Agreement shall not affect the rights of either party to recover for breaches occurring (or with respect to matters relating to Loans originated) prior thereto or with respect to provisions of this Agreement that by the nature of their terms continue after termination, including Section 25.

(b)    In addition to the right of termination under this Section 18, Program Administrator, upon written notice to Merchant, may suspend Merchant's ability to submit new funding transactions on approved Loans or submit new credit applications pursuant to this Agreement. Such suspension will be for so long as Program Administrator specifies to resolve disputes between Merchant and Program Administrator or to resolve consumer or Borrower complaints related to the GreenSky® Program.

(c)    Notwithstanding termination of this Agreement, the provisions of this Agreement will continue in full force and effect as to all Transaction Requests accepted or approved by a Funding Participant under the GreenSky® Program prior to termination; provided, however, that if an authorization number for a Transaction Request is no longer valid, neither Program Administrator nor any Funding Participant will be obligated to accept such Transaction Request. In the event that Program Administrator has provided any equipment to Merchant in connection with the GreenSky® Program, Merchant agrees to return such equipment to Program Administrator upon termination of this Agreement.

(d)    In the event of breach of this Agreement by either party, the non-breaching party will be entitled to exercise any and all rights and remedies as shall be available to it at law or in equity. The non-breaching party may exercise remedies concurrently or separately, and the exercise of one remedy will not be deemed either an election of such remedy or a preclusion of the right to exercise any other remedy.

19.    **Reserve Account; Related Matters.**

If (a) Program Administrator, at the direction and under the control of Funding Participants, determines that (i) Merchant's financial condition has deteriorated or is deemed, in the sole discretion of Program Administrator, to be unacceptable, (ii) Merchant is in breach of this Agreement, (iii) the GreenSky® Program has experienced unusual levels of Borrower disputes or complaints from Borrowers or third parties, including regulatory authorities, relating to Merchant, or (iv) the number of Transaction Requests presented to the GreenSky® Program by Merchant is substantially different from historical trends, (b) Program Administrator becomes aware of some other fact, event or circumstance related to Merchant that causes it to believe that a reserve fund is reasonably necessary or advisable, or (c) a notice of termination has been provided by either party to the other in connection with this Agreement, then, and in each such case, (x) Merchant will pay Program Administrator, on behalf of Funding Participants, upon demand, or (y) Program Administrator

may, on behalf of Funding Participants, withhold from any amounts owed Merchant in respect of any Transaction Request, or (z) Program Administrator may, on behalf of Funding Participants debit Merchant's bank account, an amount Program Administrator deems necessary to fund a reserve ("Reserve Account"). Program Administrator may charge to the Reserve Account any amount Merchant owes Program Administrator or Funding Participants or that is otherwise due from Merchant under this Agreement. Merchant's obligations to Program Administrator and Funding Participants shall not be limited by the amount held in the Reserve Account. The Reserve Account does not excuse Merchant from paying any amount that Merchant would otherwise owe under this Agreement. Merchant shall not be entitled to any interest on amounts held in the Reserve Account. Program Administrator will return to Merchant any amount remaining in the Reserve Account when Program Administrator determines a Reserve Account is no longer necessary; provided, however, no refund shall be made later than one year from the termination date of this Agreement. In addition, upon the occurrence of any of the events described in clauses (a), (b) or (c) of the first sentence of this Section 19, Program Administrator may, on behalf of itself and Funding Participants, impose such limitations on Merchant's participation in the GreenSky® Program, or take such other action, as Program Administrator deems appropriate.

20.    **Merchant Ineligible for Loan.**

Merchant acknowledges and agrees that neither it nor any of its owners, directors, officers, members, managers, representatives, employees or any member of their immediate families is eligible for a Loan.

21.    **Assignment.**

(a)    Merchant may not assign this Agreement without the prior written consent of Program Administrator, acting on behalf of, and at the direction and under the control of, Funding Participants; any purported assignment without such consent shall be void. Program Administrator and Funding Participants may assign this Agreement and any of the rights or obligations hereunder at any time. In the event of such assignment, the assignee thereof shall have the same rights and remedies as any assignor under this Agreement, provided that such assignor shall not be relieved of its obligations hereunder arising prior to such assignment unless such assignment is part of an assignment of all or substantially all of its assets and the assignee assumes its obligations hereunder. Otherwise, this Agreement is binding upon the parties and their successors and assigns.

(b)    Merchant acknowledges that Program Administrator will enter into agreements with Funding Participants to provide financing under the GreenSky® Program and that such persons will originate and own the Loans contemplated hereby. Each Funding Participant shall be a third party beneficiary of the obligations of Merchant hereunder and shall have the benefit of such obligations and the right to enforce (but not to the exclusion of GreenSky for its own account) such obligations with respect to any Loan(s) with respect to which it is the Relevant Funding Participant.

22.    **Insurance.**

During the term of this Agreement and thereafter for so long as Merchant has any obligations with respect to the GreenSky® Program, Merchant shall maintain at its expense insurance in such amount and against such risks as is customary for businesses of a comparable size in the industry in which Merchant operates. Insurance coverage shall be issued by a carrier rated "A VIII" or higher by A.M. Best or that otherwise is reasonably acceptable to Program Administrator, acting on behalf of, and at the direction and under the control of, Funding Participants, which acceptance will not be unreasonably withheld. If requested by Program Administrator or Funding Participants, Program Administrator and Funding Participants shall be named as additional insureds under each policy. If requested by Program Administrator acting on behalf of Funding Participants, Merchant shall provide Program Administrator with a certificate of insurance evidencing such insurance coverage and renewals thereof. Merchant shall notify Program Administrator if any required insurance policy is cancelled, not renewed or modified in any material respect within 15 days of any such cancellation, non-renewal or modification.

23.    **Merger and Integration.**

Except as specifically stated otherwise herein, this Agreement, together with the Operating Instructions, sets forth the entire understanding of Program Administrator and Merchant relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement and the Operating Instructions. This Agreement may not be modified, amended, waived or supplemented except as provided herein. All exhibits, schedules and addendums hereto and any documents or instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

24.    **Merchant Obligations Unaffected.**

Merchant's obligations under this Agreement are not affected by any settlement, extension, forbearance or variation in terms that Program Administrator, at the direction and under the control of Funding Participants, may grant in connection with any Loan or by the release of the obligations of any Borrower by a court or by operation of law.

Program Agreement v. 5.3

25.    **Indemnification; Related Matters.**

(a)    Merchant shall indemnify, defend (at Merchant's sole expense and with counsel reasonably acceptable to Program Administrator acting on behalf of, and at the direction and under the control of, Funding Participants), and hold harmless Program Administrator and any Funding Participant that funds or owns a Loan (or the economic rights thereto) to a customer of Merchant (and their respective officers, directors, shareholders, members, partners, managers, employees, representatives and agents) (each a "GreenSky® Program Indemnified Person") from and against any and all losses, claims, investigations, litigation, proceedings, liabilities, damages, administrative charges and expenses (including attorneys' fees) of any kind whatsoever (collectively a "Loss") directly or indirectly arising out of or related to Merchant's breach of any obligation owed to Program Administrator or any third party, including: (i) breach of any representation, warranty or covenant of Merchant contained in this Agreement, including the Merchant Program Agreement Compliance Addendum attached hereto; (ii) failure of Merchant to comply with any applicable federal, state or local law, rule, regulation or ordinance; (iii) any Loss sustained by or threatened against any GreenSky® Program Indemnified Person attributable in whole or in part to negligence, fraud, error (whether negligent or not), omission or misconduct of Merchant, its employees, subcontractors, representatives or agents; (iv) any Loss sustained by or threatened against any GreenSky® Program Indemnified Person by reason of, or attributable in whole or in part to, Merchant's failure to perform any of its obligations, or discharge any of its responsibilities, to any person, including failure to pay Transaction Fees when due; (v) any defect in any Offerings sold or provided by Merchant or any breach of any express or implied warranty in connection with such Offerings; and (vi) any voluntary or involuntary bankruptcy or insolvency proceeding by or against Merchant; provided that Merchant shall have no obligations or liability under this Section 25(a) to the extent a Loss results solely from the gross negligence or willful misconduct of a GreenSky® Program Indemnified Person. Merchant further agrees to reimburse each GreenSky® Program Indemnified Person upon demand for all legal and other expenses (including expenses related to investigation, settlement, compromise or satisfaction) incurred by any such GreenSky® Program Indemnified Person in connection with any of the foregoing.

(b)    Merchant agrees that if it breaches any representation or warranty herein or if a Borrower asserts any claim or defense (regardless of the validity thereof) arising out of any transaction evidenced by any credit application, Loan Agreement or Transaction Request or cancels any transaction evidenced by any credit application, Loan Agreement or Transaction Request, Merchant will refund on demand the amount of any Loan affected, plus any finance or other charges related to such Loan. Merchant also agrees to indemnify and hold the GreenSky® Program Indemnified Persons harmless for any and all breaches of warranties, damages and costs, including attorneys' fees, which any GreenSky® Program Indemnified Person may sustain as a result of any such event. Program Administrator, on its own behalf or on behalf of Funding Participants (as applicable), may, at its option, deduct any amount Merchant owes Program Administrator or Funding Participants pursuant to this paragraph (b) or any other provision of this Agreement from any amount Program Administrator or Funding Participants may owe Merchant. Where Merchant has reimbursed, indemnified or held GreenSky® Program Indemnified Persons harmless, or where Program Administrator, on its own behalf or on behalf of Funding Participants (as applicable), has deducted such amounts from any amount Program Administrator or a Funding Participant owes Merchant, Merchant shall have the rights specified in Section 12(b)(v), subject to the limitations contained therein.

(c)    Program Administrator shall indemnify, defend (at Program Administrator's sole expense and with counsel reasonably acceptable to Merchant) and hold harmless Merchant (and Merchant's officers, directors, shareholders, members, partners, managers, employees and agents) (each a "Merchant Indemnified Person") from and against any Loss directly or indirectly arising out of (i) the gross negligence or willful misconduct of Program Administrator, and (ii) its failure to comply with the terms of this Agreement or any applicable federal, state, or local law, rule, regulation or ordinance; provided that Program Administrator shall have no obligations or liability under this Section 25(c) to the extent a Loss results solely from the gross negligence or willful misconduct of a Merchant Indemnified Person.

(d)    In the event that a GreenSky® Program Indemnified Person or a Merchant Indemnified Person shall receive any claim or demand or be subject to any suit or proceeding in connection with which a claim may be made against such person under this Section 25, the indemnified party shall give prompt written notice thereof to the indemnifying party and the indemnifying party will be entitled to participate in the settlement or defense thereof; provided that the failure to give such notice in a timely manner shall not impact the availability of indemnification except to the extent that it materially and adversely impacts the defense of any such claim or demand. In any case, the indemnifying party and the indemnified party shall cooperate (at no cost to the indemnified party) in the settlement or defense of any such claim, demand, suit or proceeding.

(e)    In the event and for so long as any GreenSky® Program Indemnified Person actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving Merchant or any customer of Merchant, Merchant will cooperate with such GreenSky® Program Indemnified Person and its counsel with respect thereto, make available any personnel under its control, and provide such testimony and access to its books and records, including allowing copies to be made by such GreenSky® Program Indemnified Person or its representatives, as shall be reasonably necessary in connection therewith, all at the sole cost and expense of Merchant.

26.   **Nonwaiver and Extensions.**

The parties shall not by any act, delay, omission or otherwise be deemed to have waived any rights or remedies hereunder. Each party agrees that the other party's failure to enforce any of its rights under this Agreement shall not affect any other right or the same right in any other instance.

27.   **Ownership of GreenSky® Program.**

Neither Merchant nor any parent, subsidiary or other Affiliate of Merchant shall by virtue of this Agreement secure any title to or other ownership interest in any elements of the GreenSky® Program, including the Operating Instructions, written specifications, training materials, programs, systems, screens or any documentation or materials relating thereto, which are Program Administrator's or any Funding Participant's exclusive property. Merchant agrees to use the elements of the GreenSky® Program and information about the GreenSky® Program only for the purpose of enabling Merchant to use the GreenSky® Program provided under this Agreement and for no other purpose.

28.   **Rights of Persons Not a Party.**

Except as expressly provided herein, this Agreement shall not create any rights on the part of any person not a party hereto, whether as a third party beneficiary or otherwise.

29.   **Governing Law; Severability.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to the conflict of laws provisions thereof. If any provision of this Agreement is found to be illegal, unenforceable or contrary to applicable law, such provision shall be deemed ineffective without invalidating the remaining provisions hereof and this Agreement may be reformed giving the effect to the greatest extent possible to the intentions of the parties as reflected by the ineffective provision.

30.   **Independent Contractor.**

This Agreement does not (and shall not be construed to) establish a partnership, joint venture, agency relationship or other form of business association between Merchant and Program Administrator or any Funding Participant. Program Administrator and Merchant are independent contractors, and neither party shall have the authority to speak for, commit or bind the other party.

31.   **Actions of Employees.**

Each party is responsible for the actions of its employees. In the event employment of an employee is terminated, the party that employed such former employee will take reasonable steps to ensure that such former employee no longer has access to the GreenSky® Program systems (including changing any passwords necessary to access such information or system or any confidential information relating to, or arising from, the GreenSky® Program).

32.   **Notices.**

All demands, notices and communications hereunder shall be in writing. Notices shall be and deemed to have been duly given (a) three Business Days from the date of mailing by regular first class U.S. mail; (b) one business day from the date of mailing by a commercial overnight carrier (providing proof of delivery); (c) the business day on which notice is sent by facsimile with a date and time confirmation sheet that the fax went through to the other party; or (d) the business day on which notice is sent by e-mail, provided that notice shall not be deemed to have been duly given to any Merchant with respect to which Program Administrator has received an indication the e-mail was not actually delivered to such Merchant. For purposes of this Section 32, Saturdays, Sundays and federal holidays shall be considered non-Business Days. All notices to Program Administrator and a Funding Participant hereunder shall be sent to the address set forth below or to such other address, fax number or e-mail address as Program Administrator may advise Merchant in writing. Notices to Merchant shall be sent to Merchant's postal or street address, fax number or e-mail address set forth in the Application or such other address, fax number or e-mail address as Merchant may advise Program Administrator in writing.

If to Program Administrator:         GreenSky, LLC
                                     5565 Glenridge Connector, Suite 700
                                     Atlanta, GA 30342
                                     Attention: Chief Legal Officer

Program Agreement v. 5.3

33.   **Execution.**

This Agreement, through execution of the Application, may be executed by facsimile or some other enforceable electronic signature, which shall be deemed an original.

34.   **Marks.**

Merchant hereby grants Program Administrator, on behalf of itself and Funding Participants, a nonexclusive license to use its name, trademarks, logos and other marks in connection with the administration and operation of the GreenSky® Program during and after the term of this Agreement.

35.   **Press Release.**

Merchant agrees not to issue any announcement concerning the GreenSky® Program or Merchant's relationship with Program Administrator or any Funding Participant in a press release or other similar communication to the general public without Program Administrator's prior written consent.

36.   **Call Monitoring.**

With respect to any calls Program Administrator may make to Merchant or Merchant may make to Program Administrator, Merchant acknowledges that such calls may be monitored or recorded by Program Administrator for quality assurance or other purposes.

37.   **DAMAGES; ATTORNEYS' FEES.**

MERCHANT SHALL BE LIABLE TO GREENSKY® PROGRAM INDEMNIFIED PERSONS FOR ALL DAMAGES UNDER APPLICABLE LAW AND COSTS INCURRED IN ANY COLLECTION ACTION OR OTHER LEGAL PROCEEDING ANY GREENSKY® PROGRAM INDEMNIFIED PERSON MAY BRING AGAINST MERCHANT (INCLUDING ATTORNEYS' FEES, COURT COSTS, INTEREST, FILING FEES AND OTHER EXPENSES OF ANY KIND WHATSOEVER).  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL ANY GREENSKY INDEMNIFIED PERSON BE LIABLE TO MERCHANT OR ANY OTHER PERSON FOR ANY GENERAL, PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR COVER DAMAGES, INCLUDING LOSS OF PROFIT, LOSS OF PERSONAL PROPERTY, OR ANY OTHER SIMILAR DAMAGE OR LOSS.

38.   **JURISDICTION.**

ANY SUIT, COUNTERCLAIM, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, ANY RELATED DOCUMENT OR UNDER ANY OTHER DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, MUST BE BROUGHT BY EITHER PARTY EXCLUSIVELY IN THE STATE OR SUPERIOR COURT OF FULTON COUNTY, GEORGIA OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, AND THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND ANY APPELLATE COURTS THEREOF FOR THE PURPOSE OF ANY SUCH SUIT, COUNTERCLAIM, ACTION OR PROCEEDING OR JUDGMENT THEREON (IT BEING UNDERSTOOD THAT SUCH CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WAIVES ANY RIGHT TO SUBMIT ANY DISPUTES HEREUNDER TO ANY COURTS OTHER THAN THOSE ABOVE).

39.   **WAIVER OF JURY TRIAL; NO CLASS ACTION.**

GREENSKY® PROGRAM INDEMNIFIED PERSONS AND MERCHANT INDEMNIFIED PERSONS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, ANY RELATED DOCUMENT OR UNDER ANY OTHER DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREE THAT ANY SUCH ACTION, SUIT, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ENTERING INTO THE AGREEMENT.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HERETO AGREES THAT ANY SUCH PROCEEDING WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION.

40.   **Further Assurances.**

Each party hereto agrees to execute all such additional documents and instruments and to do all such further things as the other party hereto may reasonably request in order to give effect to and consummate the transactions contemplated hereby.

41.   **Construction.**

(a)      For purposes of this Agreement, whenever the context requires: the singular number includes the plural, and vice versa; the masculine gender includes the feminine and neuter genders; the feminine gender includes the masculine and neuter genders; and the neuter gender includes masculine and feminine genders.

(b)      The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(c)      As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the word "without limitation."

(d)      Except as otherwise indicated, all references in this Agreement to "Sections," "Exhibits" and "Schedules" are intended to refer to Sections of this Agreement and Exhibits or Schedules to this Agreement.

(e)      All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein.

(f)      Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.

(g)      The word "or", when used in this Agreement, is not exclusive.

42.   **Definitions.**

For purposes of this Agreement:

(a)      "Access Device" is a card or other item displaying an Account Number issued to a Borrower for use in connection with the GreenSky® Program to access funds approved to be advanced to such Borrower by a Funding Participant pursuant to the GreenSky® Program.

(b)      "Account Number" is a unique identification number assigned by the GreenSky® Program or the applicable payment card network to a Loan.

(c)      "Affiliate" is a person that, directly or indirectly, controls, or is controlled by, or is under common control with, Merchant. For purposes of this definition of Affiliate, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise

(d)      "Agreement" is this GreenSky® Merchant Program Agreement, as modified or amended as permitted hereby.

(e)      "Application" is the GreenSky® Program Application for Merchants.

(f)      "Borrower" is a customer of Merchant who has applied for and has been approved for a Loan.

(g)      "Borrower Information" is any personal information about any applicant or co-applicant or any Borrower received in connection with a Loan, or an application for a Loan, whether included in a credit application or through use of the Account Number or Access Device or obtained from the GreenSky® Program, including the applicant or co-applicant's name, address, social security number, date of birth, income information, Account Number and Loan information.

(h)      "Business Day" is any day that is not a Saturday, a Sunday or other day on which banks are required or authorized to be closed in Atlanta, Georgia.

(i)    "Funding Participants" are the federally insured financial institutions and other persons holding title and/or economic rights to loans originated through the GreenSky® Program.

(j)    "GreenSky® Program" is a lending program administered by Program Administrator on behalf of Funding Participants that make consumer loans to customers of merchants in connection with their purchases of goods, services or merchandise from merchants.

(k)    "GreenSky® Program Indemnified Person" is defined in Section 25(a).

(l)    "Invoice" is defined in Section 8(e)(iii).

(m)    "Loan" is a loan to a Borrower created pursuant to the GreenSky® Program.

(n)    "Loan Agreement" is a written agreement between a Funding Participant and a Borrower containing the terms and conditions of a Loan.

(o)    "Loan Documents" are the Loan Agreement, associated Truth-in-Lending Act disclosures and other documentation and communications from a Funding Participant (including documentation regarding online Borrower accounts and describing the rights of Program Administrator, acting on behalf of Funding Participants, to collect from past due Borrowers).

(p)    "Loss" is defined in Section 25(a).

(q)    "Merchant" is the person named as Merchant in the Application and, for purposes of Section 25(a) with respect to a Merchant that is not publicly-traded, shall expressly include all persons who, directly or indirectly, have an ownership interest in Merchant (and, by participating in the GreenSky® Program, Merchant represents and warrants that all authorizations and approvals of any such persons necessary for them to be included in the definition of Merchant for such purpose have been obtained).

(r)    "Merchant Indemnified Person" is defined in Section 25(c).

(s)    "Offerings" are any goods, services or merchandise that Merchant offers, sells, distributes, provides or installs or that are offered, sold, distributed, provided or installed on behalf of Merchant, other than any goods, services or merchandise designated by Program Administrator as not eligible for the Program in the Operating Instructions or otherwise in a notice provided to Merchant.

(t)    "Operating Instructions" are any instructions or procedures that Program Administrator, at the direction and under the control of Funding Participants, communicates to Merchant and updates from time to time, provided that updates to the Operating Instructions that are applicable only to the Merchant and not other Merchants generally shall not be effective unless accepted by Merchant in writing.

(u)    "person" is an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

(v)    "Program Administrator" is GreenSky, LLC, a Georgia limited liability company, together with its Affiliates, permitted assigns and permitted designees, acting as program administrator for the GreenSky® Program at the direction and under the control of Funding Participants.

(w)    "Relevant Funding Participant" means each Funding Participant that holds a Loan or the economic rights thereto.

(x)    "Reserve Account" is defined in Section 19.

(y)    "Restricted Transactions" is defined in Section 7(g).

(z)    "Transaction Fee" is defined in Section 9.

(aa)    "Transaction Request" is evidence of a sale in paper or electronic form of Offerings purchased from Merchant by a Borrower and shall include any and all information required by this Agreement.

## Merchant Program Agreement Compliance Addendum

### GreenSky® Program Fair Lending Commitment

The Equal Credit Opportunity Act ("ECOA") apples to all persons who in the ordinary course of business regularly participate in the decision whether to extend credit to an applicant. The Funding Participants expect Program Administrator and Merchant to offer the GreenSky® Program in a manner that complies with the ECOA and its enacting regulations.

The ECOA prohibits discrimination in the granting of credit and further states that the applicants for credit shall not be discriminated against because of the person's race, color, religion, national origin, sex, marital status, or age (provided that the applicant has the capacity to enter into a binding contract), the fact that all or part of the applicant's income derives from any public assistance program, or the fact that the applicant has in good faith exercised any right under the federal Consumer Credit Protection Act. State law may also apply to credit products and expand the definition of protected classes to include, among other things, a person's sexual orientation. In addition, the ECOA contains rules as to creditor requirements for co-makers or co-applicants on an extensions of credit.

To help ensure compliance with the ECOA, set forth below are certain requirements and procedures with which Merchant must comply:

1. Merchant must obtain a completed Program Administrator-approved credit application on each applicant. Each applicant must verify its accuracy and authorize Program Administrator and Funding Participants to investigate the applicant's credit background.
2. Merchant must advise each applicant that the credit application will be sent to Program Administrator and the Funding Participants.
3. Merchant must take all reasonable steps, including obtaining complete applicant name, physical address, Social Security number and date of birth, to determine and authenticate the identity of an applicant and to confirm that the applicant has a valid government-issued photo identification document.
4. Program Administrator, on behalf of the Relevant Funding Participant, will send an adverse action notice, including ECOA notifications, to each applicant whose request for credit cannot be approved.
5. Merchant represents and warrants to Program Administrator that the Merchant will comply with the requirements of ECOA and any regulations, policy statements, and guidance promulgated or announced by federal or state agencies, including the Consumer Financial Protection Bureau, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, or the office of the Comptroller of the Currency, concerning compliance with ECOA or other fair lending requirements. Without limitation of the general obligation to comply with ECOA, Merchant represents and warrants any plans made available to Borrowers are offered to all Borrowers equally and are negotiated with Borrowers using only good faith, competitive business reasons and in a manner that does not discriminate against any protected class under ECOA; and that loans originated by Merchant, taken as a group, will not reflect any disparate impact or treatment of a protected class.

Failure to comply with the terms of this Merchant Program Agreement Compliance Addendum is a material breach of the Agreement.

**EXHIBIT B**



252 Walton Drive Morrisville, PA 1906.    Phone: 215-295-7417

# PREMIER WATERPROOFING, LLC

**Proactive Waterproofing - Crawlspace Membranes - Mold Solutions - Rhino Carbon - Grip Tite Wall Anchors & Basement Finishing**

| | | | | |
|---|---|---|---|---|
| **Date:** | 2-16-2018 | **Survey Date:** | 2-16-2018 | **Install date  2-28-2018** |
| **Name:** | Laraine Conte | **Address:** | 78 Wilburtha Rd Ewing NJ | |
| **Email:** | Laraineconte@yahoo.com | **Contact:** | 609-883-8624 / Cell 609-571-8524 | |

Herein referred to as owner, for contract work to be performed at premises set forth above, according to the following terms and specifications. All proposals are based on the homeowners description of the problem and their accomplish list. All work to be completed according to the standard practices. Our workers are fully covered by workmen's compensation insurance. Payment is to be made in full upon completion. Any alterations or deviations from the specifications involving extra cost will be executed only upon written orders, and will become an extra charge over and above the estimate. **Premier Waterproofing is a licensed contractor in both Pennsylvania PA047568 and New Jersey 13VH05770200.**

**If your project is inclusive of  installing an Interior Sub Soil  Pressure Relief System** We will remove a section of floor (approximately  10 inches wider than the footer and to 10 inches deep ) or according to depth and width specified by the manufacture, or design, around the perimeter of the basement floor or **areas specified in the contract.** These measurements can vary depending on the thickness of the floor and the size of the footer. Walls that exhibit hollow core blocks will have weeps holes installed at the bottom of the first course block or at the base of the foundation. Weep holes are drilled into every hollow core of the block and the mortar joint. Weeps holes are necessary to drain water from the block, into the pressure relief system.  If cores are filled, our foreman will discuss needed design changes and extra charges with you. Seepage problems to a monolithic poured foundation will exhibit the same system, however we will build/form box ledge method back to the cove joint area. If you purchase a **Santa Fe dehumidifier** it will be connected to the sump pump management station. **Installation of the system does not include painting, finishing carpentry, installing any electric work, or replacement of floor tile or carpeting unless specified in this contract.**

**Basement >    Relative Humidity 70.6%R/H    Basement Temperature 68.1 degrees    Time  3:30pm**

**Problem:** Hydro Static Pressure  Seepage  –  Visible Toxic Mold & Air bourn Mycotoxins –  Efflorescence – Water trapped in block walls
**Scope of work to performed:** Design a Proactive Dry all the time waterproofing Design / Disinfect Fungicide + Apply Antimicrobial Coating

Customer agrees to keep the driveway and parking area clear for parking of trucks and storage of materials.
1) Set-up Air Scrubber machine and containment to provide a proactive environment – cover items in basement with Plastic shield
2) **Foundation Waterproofing Solutions:** Stage 20 yard dumpster > remove all contaminates / moldly items
3) **Install 175 lnft of Sub – Soil – 4" Double wall Interior  ADS Pressure Relief System:   ((( all Basement  walls  )))**
4) Our Team will open the trench 10 inches wider than the footer and dig to 10 inches deep ( to create 2" gravity slope to the sump system
5) Install Trench Membrane to filter sediment deposits from entering the drainage pipe
6) Drill engineered weep holes in lower course block, to relieve capillary action
7) After the System is solved, we will install the drainage pipe. Then back fill trench… with ¾ washed stone – then install a vapor barrier
8) Next, we will install Mira Drain Storm Flow panel at the cove joint at a 90 degree position / then Re-Concrete floor back to like kind
9) Install (2) Closed lid Jackel Sump pits > to reduce relative humidity and radon gas
10) Install (2) Sump Systems: Primary (1/3hp) Zoeller Sump Systems (2400 GPH) with 1 ½ inch Discharge line + Check Valves
11) Fungicide walls and ceiling with Fosters 40/80
12) Apply Fosters 20/45 Antimicrobial Coating (white) to foundations walls where exposed
**13)** Install (1) Santa Fe Classic dehumidification system with MERV 11 HEPA filter Air Filtration system
14) Install (4) Hydrophobic PolYurethane ZERT PORT crack Injections
15) **Broom Clean work area. Test System. Haul Dirt and Concrete Only –**
**Lifetime Transferable Warranty on Pressure Relief System!**                                          **Cost    $ 21,000**

**Not included in this contract, but for future consideration:**

| Attention Production Department: Please stage these items for the above project | | | | | | | |
|---|---|---|---|---|---|---|---|
| Yes | Use Drop Clothes | Yes | Examine Footer | 175 | Sub Soil Drainage Sys | 2 | Mold & Radon Basin | 4 | Crack Injections |
| | Negative Air Mac | Yes | Drill Weep Holes | 175 | Trench Membrane | 2 | 1/3 hp Zoeller Sump | | Replacement windows |
| Yes | Containment | Yes | Disinfect & Fungicide | 175 | Trench Vapor Barrier | | 1/2 hp Zoeller Sump | | Grip Tite Wall Anchors |
| | Open Sheet rock | | Mold Fogging | 175 | Mira Drain Panel | | 3/4 hp Zoeller Sump | | Under Pining |
| | Demo shelves | | Thermal Armor | | Surface Trench Drain | | Pro Series Back Up | | I-Beam supports |
| | Cut Studs | Yes | Mold Paint EPA | | Stair well Wrap | | 1 ½ Discharge Line | 1 | Santa Fe 2500 sqft syste |
| | 30 Yard Dumpster | | Caliwell Mold Coating | | Oil Tank Wrap | | Burry Discharge | | Vortex Floor Membrane |

| | | | |
|---|---|---|---|
| Total Price of the Waterproofing Agreement With all discounts and coupons applied: | $ | | 21,000 |
| First Day Draw Payment 50%: | $ | | |
| Balance due at completion Waterproofing: | $ | | 21,000 Financing GreenSky |
| | | | $25,000 |

**Projected Project Start Date**   Feb 28, 2018   **Projected Project Completion**   5 day or less

**Terms and agreements:**

Any delays caused by the weather, materials (damaged or late) labor disputes, municipal or county approvals, acts of war or acts of God will change the start and finish date a minimum of one day for every day lost to the above date. Any delays in receiving customer's deposit, schedule draw payments, change order payments will change the finish date a minimum of one day for every day lost to the above date. Any alterations or deviations from the specifications involving extra cost will be executed only upon written orders from the signing agent, and will become an extra charge over and above the original contract. All change orders need to be paid in full - before work begins.

**WARRANTY :**

Interior drainage systems/ Sub-soil Pressure Relief Systems have a" life time " warranty against seepage and defect at the cove joint. Warranty is automatically transferable to all subsequent owners. Partial systems have a "limited warranty" to cover only the area in which the system was installed - against seepage and defect at the cove joint. Any wall cove joints(s) that have been omitted by the customer/signing agent have no warranty. Exterior Drainage systems have a 5 yr Warranty. We recommend repairing all structural issues and concerns when finishing your basement. Ask your Design Consultant for the most proactive design. Sump pump motors have a 1 year separate manufacture warranty against defect . Roughcasting has a 2 yr. Warranty. Santa Fe'Dehumidifiers' have a 1 year Factory Warranty. Grip-Tite Stabilization Pier's and Grip ZERT PORT Crack injection have a lifetime Transferable warranty. Tite Wall Anchors  – See manufactures warranty. RHINO Carbon Fiber Wall Stabilizers Straps have life of the structure warranty - See manufactures Warranty. Antimicrobial costing – see manufacture warranty. Thermal Armor has a 5 year limited warranty against defect:  We don't warrant against malicious conduct or accidental tears, ruptures or vandalism to the Thermal Armor Vapor Barrier. However, repairs can be scheduled at a moderate cost.

**Unforeseen Conditions:** all though it is unlikely, some basement foundations have been backfilled with construction debris, large amounts of concrete, shale, granite and boulders, or may exhibit an underground stream - which may prevent us from performing our scope of work. With that said, Premier Waterproofing reserves the right to cancel this contract upon opening the floor should conditions exist which would prevent the installation of a Pressure Relief Systems and its components. Customer/signing agent agrees to hold Premier Waterproofing harmless for any monetary value which may result from cancelation of this contract. Premier Waterproofing will re-cement the floor to its original height and level before we leave the property; should this problem exist. Premier Waterproofing will refund your deposit within 30 days of the installation date. We look forward to exceeding your expectations.

**Basements that have defective or damaged items:** This agreement is based upon the assumption where applicable that our installers will be able to remove any defective item without incident. When our installation team has access to all defective or damaged items, additional problems may become apparent and additional repairs and costs may be required. Premier Waterproofing cannot be held responsible for old corroded plumbing that may be leaking or may leak if disturbed, dangerous electrical problems or insufficient floor thickness or pre-existing wall and floor cracks. Premier Waterproofing  cannot be held responsible or liable for existing code violations, required upgrades, or scope inclusions that may be required to be corrected or added by the construction code official, building inspector or their subordinates – if you haven't authorized us to do so, in this contract.

**EXCLUSIONS :** Premier Waterproofing,LLC  does not warrant against conditions over which we have no control, such as, but not limited to:  floods,  water entering over the sill plate, window well seepage, frozen or clogged discharge lines, loss of power, unplugged sump motors, power outages, defective or burnout sump motors, battery back-up systems. We do not provide a warranty for floor or wall cracks that may leak - if they are not specified in the contract for repaired. Premier Waterproofing,LLC shall be held harmless for  pre-existing structural damage, conditions of masonry, damages to buried oiled lines, backing up sewer systems, sealing pipes, condensation, Porous or mud filled blocks from iron ore residue. Premier Waterproofing,LLC  shall be held harmless for any damage caused by specialty contractors or tradesmen not affiliated with our company. We are not responsible and do not guarantee any damage to personal property or items in the basement.

Any holder of this contract is subject to all claims and defenses which the owner could assert against Premier Waterproofing,LLC.  Recovery by owner or any successor of the owner under this contact shall not exceed amounts paid to Premier Waterproofing.LLC .  Any unpaid balance due from the signing agent, owner or successor beyond the completion date is subject to a daily interest rate of 1.25% per day, in addition to, all legal fees.  Any disputes, controversies or claims between Owner / Signing Agent and Premier Waterproofing,LLC , including but not limited to all statutory claims and all claims that arise from, or related to this contract, or the work to be performed by Premier Waterproofing shall be resolved by arbitration administered by the B.B.B.  (Better Business Bureau) or legal consul in Bucks County, PA.

### Owner's Acceptance

The Owner(s) or Trustee upon signing this agreement represent(s) and warrants that they are the Owner(s) or Owners representative of the aforesaid premises and that they have read this agreement. The above prices, specifications, conditions and separate warranty are satisfactory and hereby accepted. You are authorized to do the work as specified.

x_____date _____
Customer's / Agent Authorization

x_____            2-16-2018
Design Consultant  for Premier Waterproofing LLC     sampar5@yahoo.com_____

### Right of Rescission

YOU MAY CANCEL THIS AGREEMENT AT ANY TIME BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER RECEIVING A COPY OF THIS AGREEMENT.  IF YOU WISH TO CANCEL THIS AGREEMENT, YOU MUST EITHER:
SEND A SIGNED & DATED WRITTEN NOTICE OF CANCELLATION BY REGISTERED OR CERTIFIED MAIL, RETURN RECIEPT REQUESTED; OR, FAX A COPY TO OUR OFFICE OF CANCELLATION TO:  **Premier Waterproofing**  252 Walton Drive Morrisville PA  19067 **1-215-295-6168**

**EXHIBIT C**

winbergmike@aol.com                                                          3/4/2018 2:38 PM

## Premier Waterproofing

To guarino118@comcast.net <guarino118@comcast.net>   Copy sampar56@yahoo.com

**Janet, Terri and Laraine,**

Thank you again for your business. And Thank you so much for your patience with GreenSky - as well as your time on the phone with Sam, working out all the details of processing the payment.

**Just to clarify the amount of your project, the bank fees and credit cards processing amounts:**

GreenSky only offers one plan without bank fees. The plan is called 9999. Meaning the interest rate is 9.99% for 84 months. With that said your monthly payment would have been $455.38 for 84 months.

**Janet, Terri and laraine requested** a low interest loan with an affordable payment option af 2.99% (plan1442)  for 144 months.

The bank fee for a 2.99% interest rate is 18 precent of the project amount ($21,000) = $3,780 a one time bank fee.

The bank fee has no effect of the interest to be paid back on the loan amount and term. It is a one time fee to buy down on the interest rate only.

Contract over view:
The project amount is                          $21,000
The bank fee for 2.99% is 18% of the project amount $  3,780
Credit card Processing fee   3% of the     $    750
total        $ 25,530

The authorization credit card amount to Premier Waterproofing is $25,000 to be processed.
Premier Waterproofing will incur the bank fee obligation payment to GreenSky in the amount of $ $3,780 ⋯ when invoiced from GreenSky.

If you have any questions or concerns, please contact Mike at 609-964-8008.

Kind regards,
Mike W & Sam S
Premier Waterproofing,LLC
215-295-7417 Office
609-964-8008 Mike's Cell
www.premierwaterproofing.com
Kind regards,
Mike W, Jim R & Sam S
Premier Waterproofing,LLC
215-295-7417 Office
609-964-8008 Mike's Cell
www.premierwaterproofing.com

- laraine Conte 78 Wilburtha Rd Ewing NJ 609-883-8624.pdf (351 KB)

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEW JERSEY

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

| | |
|---|---|
| LARAINE CONTE and JANET GUARINO, | Civil Action No.: |
| Plaintiffs, | |
| vs. | **ACKNOWLEDGMENT OF SERVICE SAM SHEAR** |
| SAM SHEAR and MIKE WINBERG Individually and as Principals, Managers of def. PREMIER WATERPROOFING LLC, and JOHN DOE and ABC CO., | |
| Defendants. | |

Receipt is hereby acknowledged of the Summons and Complaint as to the Defendant, Sam Shear in the action entitled Laraine Conte, et al. v. Sam Shear, et al. and bearing docket number MER-L-001810-20.

BY: _____
SAM SHEAR

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEW JERSEY

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

| | |
|---|---|
| LARAINE CONTE and JANET GUARINO,<br><br>Plaintiffs,<br><br>vs.<br><br>SAM SHEAR and MIKE WINBERG Individually and as Principals, Managers of def. PREMIER WATERPROOFING LLC, and JOHN DOE and ABC CO.,<br><br>Defendants. | Civil Action No.:<br><br><br><br><br><br>**CERTIFICATION OF SAM SHEAR** |

I, Sam Shear, of full age, hereby certify as follows:

1.      I have personal knowledge of the facts stated herein.

2.      I am named individually as a defendant in the above-referenced matter.

3.      I am also a member and the President of Premier Waterproofing LLC.

4.      My personal residence is in Bucks County, Pennsylvania.

5.      Premier Waterproofing LLC is a business entity formed pursuant to the laws of Pennsylvania with a registered address in Bucks County, Pennsylvania, which is my personal residence.

6.      On October 13, 2020 a process server presented to my personal residence with two summonses, however none were for myself.

7.      Instead one was for Mike Winberg and another was for Premier Waterproofing LLC.

8.      Although the Affidavits of Service, which have been shown to me by my counsel, indicate "Mike Winberg" was the person served, that is false. Annexed hereto as "**Exhibit**" are the Affidavits of Service at issue.

9.      I was the one that received the documents from the process server, at my residence.

10.     I did not give my name as "Mike Winberg" to the process server.

11.     Mike Winberg does not reside at my residence and was not present when the process server appeared on October 13, 2020.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by are willfully false, I am subject to punishment.

BY:  _____

Dated:  November 18, 2020

SAM SHEAR, individually and on
behalf of Premier Waterproofing LLC

# ▽ HELLOSIGN

Audit Trail

| | |
|---|---|
| **TITLE** | Shear.pdf |
| **FILE NAME** | Shear.pdf |
| **DOCUMENT ID** | 82ea0c50f3a0d771964b842c1058d5b74864a7b8 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| ⟳ **SENT** | **11 / 18 / 2020** 19:30:22 UTC | Sent for signature to Premier Waterproofing LLC (sampar56@yahoo.com) from jheldman@vazquezfirm.com IP: 71.172.32.56 |
| 👁 **VIEWED** | **11 / 18 / 2020** 19:35:37 UTC | Viewed by Premier Waterproofing LLC (sampar56@yahoo.com) IP: 98.111.164.62 |
| ✒ **SIGNED** | **11 / 18 / 2020** 19:36:47 UTC | Signed by Premier Waterproofing LLC (sampar56@yahoo.com) IP: 98.111.164.62 |
| ✓ **COMPLETED** | **11 / 18 / 2020** 19:36:47 UTC | The document has been completed. |

# EXHIBIT

LARAINE CONTE, ET AL

            **Plaintiff**

        vs

SAM SHEAR, ET AL

            **Defendant**

**Person to be served** (Name and Address):
PREMIER WATERPROOFING, LLC
252 WALTON DRIVE
MORRISVILLE PA 19067
**By serving:** PREMIER WATERPROOFING, LLC

**Attorney:** GEORGE T. DOUGHERTY, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, DEMAND, CERTIFICATION, EXHIBITS

**Service Data:**    [ ✓ ] Served Successfully    [ ] Not Served

Date/Time: _10/13/2020 6:36 PM_     _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[ ✓ ] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

---

20201013133558

Superior Court Of New Jersey

MERCER Venue

Docket Number: MER L 1810 20

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

Name of Person Served and relationship/title:

_Mike Winberg_

_Owner_

---

**Description of Person Accepting Service:**

SEX: _M_ AGE: _59_ HEIGHT: _5'10"_ WEIGHT: _200_ SKIN: _White_ HAIR: _Brown_ OTHER: _____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:     Date/Time: _____
                        Date/Time: _____
                        Date/Time: _____

Other:

---

**Served Data:**
Subscribed and Sworn to me this
_15th_ day of _October_ , 20 _20_

Notary Signature: _____

Name of Notary _____
Commission Expiration

Commonwealth of Pennsylvania - Notary Seal
STEPHANIE HOPE SEGAL, Notary Public
Bucks County
My Commission Expires Apr 11, 2024
Commission Number 1240980

Name of Private Server: _____

I, _Scott Segal_ ,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_Scott Segal_      _10/15_/20_20_
Signature of Process Server          Date

Address: 2009 Morris Avenue UNION, NJ 07083 Phone: (800) 672-1952

LARAINE CONTE, ET AL

Plaintiff

vs

SAM SHEAR, ET AL

Defendant

20201013132613

Superior Court Of New Jersey

MERCER Venue

Docket Number: MER L 1810 20

**Person to be served** (Name and Address):
MIKE WINBERG, INDIVIDUALLY & AS PRINCIPAL, MANAGER OR PREMIER
WATERPROOFING, LLC
252 WALTON DRIVE
MORRISVILLE  PA  19067
**By serving:** MIKE WINBERG, INDIVIDUALLY & AS PRINCIPAL, MANAGER OR
PREMIER WATERPROOFING, LLC

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

**Attorney:** GEORGE T. DOUGHERTY, ESQ.

$ _____.____

**Papers Served:** SUMMONS AND COMPLAINT, CIS, DEMAND,
CERTIFICATION, EXHIBITS

Name of Person Served and relationship/title:

**Service Data:**  [✓] Served Successfully      [ ] Not Served

*MIKE WINBERG*

Date/Time:  *10/12/2020 6:36pm*  _____

*Self*

[✓] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing
therein (indicate name & relationship at right)

[ ] Left a copy with a person authorized to accept service, e.g. managing agent,
registered agent, etc. (indicate name & official title at right)

**Description of Person Accepting Service:**

SEX: *M* AGE: *59* HEIGHT: *5'10"*  WEIGHT: *200*  _____ SKIN: *White*  HAIR: *Brown* OTHER: _____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:       Date/Time: _____
                         Date/Time: _____
                         Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this
*15th* day of *October* , 20 *20*

Notary Signature: _____

Name of Notary _____

Name of Private Server: _____

Commonwealth of Pennsylvania - Notary Seal
STEPHANIE COLLINS - Notary Public
Bucks County
My Commission Expires Apr 11, 2024
Commission Number 1240980

I, *Scott Segal* _____
was at the time of service a competent adult, over the age of
18 and not having direct interest in the litigation. I declare
under penalty of perjury that the foregoing is true and
correct

Signature of Process Server      *10 / 15 / 20 20*
                                       Date

Address: 2009 Morris Avenue UNION, NJ 07083 Phone: (800) 672-1952

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEW JERSEY

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

|  |  |
|---|---|
| LARAINE CONTE and JANET GUARINO, | Civil Action No.: |
| Plaintiffs, | |
| vs. | **ACKNOWLEDGMENT OF SERVICE** |
| SAM SHEAR and MIKE WINBERG Individually and as Principals, Managers of def. PREMIER WATERPROOFING LLC, and JOHN DOE and ABC CO., | **MIKE WINBERG** |
| Defendants. | |

Receipt is hereby acknowledged of the Summons and Complaint as to the Defendant, Mike Winberg in the action entitled Laraine Conte, et al. v. Sam Shear, et al. and bearing docket number MER-L-001810-20.

BY: _Michael Winberg_____
      MIKE WINBERG

Doc ID: 5926945b4e3206ae906dacadfd2b478aace90ce9

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF NEW JERSEY

Jeffrey Heldman, Esq. (JH7928)
VAZQUEZ HELDMAN
18 Hook Mountain Road, Suite 201
Pine Brook, New Jersey 07058
(973) 434-7062
Attorneys for Defendants Sam Shear, Mike Winberg and Premier Waterproofing LLC

| | |
|---|---|
| LARAINE CONTE and JANET GUARINO, | Civil Action No.: |
| Plaintiffs, | |
| vs. | **CERTIFICATION OF MIKE WINBERG** |
| SAM SHEAR and MIKE WINBERG Individually and as Principals, Managers of def. PREMIER WATERPROOFING LLC, and JOHN DOE and ABC CO., | |
| Defendants. | |

I, Mike Winberg, of full age, hereby certify as follows:

1.  I have personal knowledge of the facts stated herein.

2.  I am named individually as a defendant in the above-referenced matter.

3.  I am a permanent resident of Bucks County, Pennsylvania and do not own a residence in the State of New Jersey.

4.  I do not reside with Sam Shear and he is not authorized to accept service on my behalf.

5.  I was never personally served with a summons and complaint in this matter.

6.  My counsel showed me the Affidavits of Service uploaded by the Plaintiffs in the state action, however those are not factually correct.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by are willfully false, I am subject to punishment.

*Michael Winberg*

BY: _____

MIKE WINBERG

Doc ID: 5926945b4e3206ae906dacadfd2b478aace90ce9

# ▽ HELLOSIGN

Audit Trail

| | |
|---|---|
| **TITLE** | Winberg.pdf |
| **FILE NAME** | Winberg.pdf |
| **DOCUMENT ID** | 5926945b4e3206ae906dacadfd2b478aace90ce9 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| ⟳ SENT | **11 / 18 / 2020** 19:27:22 UTC | Sent for signature to Mike Winberg (winbergmike@aol.com) from jheldman@vazquezfirm.com IP: 71.172.32.56 |
| 👁 VIEWED | **11 / 18 / 2020** 19:31:51 UTC | Viewed by Mike Winberg (winbergmike@aol.com) IP: 71.225.222.214 |
| ✎ SIGNED | **11 / 18 / 2020** 19:34:10 UTC | Signed by Mike Winberg (winbergmike@aol.com) IP: 71.225.222.214 |
| ⊘ COMPLETED | **11 / 18 / 2020** 19:34:10 UTC | The document has been completed. |

Powered by ▽ HELLOSIGN

# EXHIBIT D

LARAINE CONTE, ET AL

                  Plaintiff

            vs

SAM SHEAR, ET AL

                 Defendant

```
20201013133558
```

Superior Court Of New Jersey

MERCER Venue

Docket Number: MER L 1810 20

**Person to be served** (Name and Address):
PREMIER WATERPROOFING, LLC
252 WALTON DRIVE
MORRISVILLE  PA  19067
**By serving:** PREMIER WATERPROOFING, LLC

**Attorney:** GEORGE T. DOUGHERTY, ESQ.

**Papers Served:** SUMMONS AND COMPLAINT, CIS, DEMAND, CERTIFICATION, EXHIBITS

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

**Service Data:**    [ ✓ ] Served Successfully    [ ] Not Served

Date/Time:  *10/13/2020 6:36pm*    _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[ ✓ ] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

*Mike Winberg*
_____

*Owner*
_____

**Description of Person Accepting Service:**

SEX: *M*  AGE: *59*  HEIGHT: *5'10"*  WEIGHT: *200*  SKIN: *White*  HAIR: *Brown*  OTHER: _____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:    Date/Time: _____
                         Date/Time: _____
                         Date/Time: _____

Other:

**Served Data:**
Subscribed and Sworn to me this

*15th*  day of *October* , 20 *20*

Notary Signature: _____

Name of Notary _____

Name of Private Server: _____

I, *Scott Segal*, was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_____    *10/15/2020*
Signature of Process Server       Date

Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952

Commonwealth of Pennsylvania - Notary Seal
STEPHANIE HOPE SEGAL, Notary Public
Bucks County
My Commission Expires Apr 11, 2024
Commission Number 1240980