UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

George T. Dougherty, Esquire (247791969)
KATZ & DOUGHERTY, LLC
4020 Quakerbridge Road
Trenton, New Jersey 08619
609-587-1199
Attys for Laraine Conte
and Janet Guarino

---

LARAINE CONTE and JANET
GUARINO

       Plaintiffs,

   Vs.

SAM SHEAR and MIKE
WINBERG, Individually
And as Principals,
Managers of defendant
PREMIER WATERPROOFING,
LLC; and JOHN DOE and
ABC CO.

---

LARAINE CONTE and JANET
GUARINO,

    Plaintiffs,

      vs.

PABLO COLON, Individually
and as former MANAGERIAL
EMPLOYEE OF SAM SHEAR AND
MIKE WINBERG, Principals of
PREMIER WATERPROOFING, LLC,
and as Principal or Manager
of NEW PREMIER WATERPROOFING,
LLC, SUCCESSOR TO PREMIER
WATERPROOFING, LLC. and JOHN
DOE and ABC CO.

    Defendants.

---

Civil Action
Dkt. No: 3:20-cv-16458--ZNQ-TJB

**THIRD AMENDED COMPLAINT
and JURY DEMAND**

1

Plaintiffs Laraine Conte and Janet Guarino, by way of Third Amended Complaint against defendants, say:

### GENERAL ALLEGATIONS PERTINENT TO ALL COUNTS

1. Plaintiff Laraine Conte residing at 74 Wilbertha Rd., Ewing Township New Jersey 08618 and Janet Guarino residing at 118 e the owners and occupants of a single-family residence located at 78 Wilburtha Road, Ewing Township, Mercer County, New Jersey, hereinafter referred to as "the Subject Property;

2. Plaintiff Janet Guarino resided at **118 Crosswicks Street, Floor 2, Bordentown, New Jersey 08505** and is the sister of plaintiff Laraine Conte (referred to herein as "plaintiff Guarino").

3. Defendants Sam Shear and Mike Winberg were and are principals, members, managers, agents and/or employees of defendant Premier Waterproofing, LLC, a business entity organized under the laws of Pennsylvania, with principal offices at 252 Walton Drive, Morrisville, Pennsylvania, (hereinafter referred to collectively as "Premier" and/or by individual sir names).

4. Premier was and is engaged in the business of diagnosing, abating and preventing water and moisture infiltration and remediating and removing resultant mold growth.

2

2.  Such remediation services, when rendered for residential homes in the State of New Jersey, constitute "Home Improvement" services as defined and regulated by the State of New Jersey Office of the Attorney General Division of Consumer Affairs.

3.  Although defendants Shear and Winberg were and are individually registered and licensed by the New Jersey Division of Consumer Affairs to perform Home Improvement Contracts within the State of New Jersey, during all times pertinent to this action, their business entity, defendant Premier Waterproofing, LLC, was not registered as a Foreign Business Entity in New Jersey.

4.  John Doe and ABC Co. are fictitious names intended to designate one or more individuals or entities who, independently or together with the Premier defendants, may have liability to the plaintiffs for the acts or omissions and violations and losses complained of herein.

5.  Pablo Colon is the owner and President of New Premier Waterproofing, LLC, having principal offices at 3346 North Orkney Street, Philadelphia Penna. during the events complained of in this litigation, he was a key employee of Premier Waterproofing, serving as a foreman of the work crews that Shear and Winberg dispatched to their individual clients.

3

## Facts Pertinent to All Counts

6.  In early 2018, the plaintiff and her husband Mark became aware of water intrusion in a portion of their basement and resultant mold growth within the basement of their home.

7.  To address the problem, they contacted several contractors, obtaining several estimates from contractors who were listed on popular home improvement web sites, all but one of which were between $18,000 and $19,000.

8.  On February 15, 2018, plaintiff Laraine Conte and her husband, Mark Conte selected the proposal of Acqua Dry Basement Waterproofing signing a contract for a total price of $18,630.

**Creation of False Sense of Hazard and Urgency**

9.  During his visit, and before making any examination of the actual moisture and mold conditions within the house, defendant Winberg observed that plaintiff's husband, Mark, was on continuous oxygen for a chronic medical condition and began to exploit Mr. Conte's medical condition to create an exaggerated sense of urgency to engage defendant Premier to address the moisture/mold conditions within the home.

10.  Unlike the other prospective contractors, without having identified the species of mold or other air quality issues, and without having acquired any insight into plaintiff's husband's actual medical condition by which to connect the mold

4

issues to his particular health issues, defendant Winberg
declared to the plaintiff and her husband that it was
"imperative" that the cellar mold condition be addressed
"ASAP", quoting a price of $21,000.

11.  On February 22, 2018, while seated at a table with
plaintiff and her husband, defendant Winberg stressed his point
that their basement remediation needed to be done immediately
or "*Mark's cancer could come back and Mark could become ill
again.*"

12.  His remarks put plaintiff and her husband in fear of
causing him to suffer a major health setback by delaying the
commencement of the moisture and mold remedial work, causing
them to cancel their contract with Aqua Dry Basement
Waterproofing, to whom they had given $3,726 on February 15,
2018, which cancellation was confirmed by Acqua Dry on February
19, 2018.

13.  Without providing the plaintiff and her husband with a
laboratory mold analysis report, defendant Winberg maintained
that he could tell the mold was a threat to Mark's health
because he viewed it through his ""naked eye" and knew there
was mold because he was "the expert."

14.  The Contes' fear of delaying the remediation work was
fanned by defendant Winberg's insisting that, before the
remediation work could be started, he and plaintiff Conte would

have to go through each of the items in storage in their basement to determine which items she wanted to save and what items she would approve for disposal.

15.   For further dramatic effect, in the presence of plaintiff's sisters, Teresa and Janet Guarino, defendant Winberg falsely declared that he and the plaintiff would have to wear "Hazmat" protective coveralls, gloves and breathing masks while sorting through the stored property in the basements due to the amount of mold within the basement and observable on the interior surfaces and on some of the stored items.

16.   Noticing the plaintiff's sensitivity to her husband's state of health, defendant Winberg induced the plaintiff to accept his $21,000 estimate by representing to her that her husband's condition required an *immediate remediation* of the mold.

17.   Prompted by Winberg's false material representations of the dangerous condition of their home combined with his false promises to protect the plaintiff's interests in protecting and retaining the personal property stored in her basement after inspecting each one jointly with the plaintiff marking them according to plaintiff's decision to retain or discard, plaintiff and her husband engaged the higher-priced Premier in place of Acqua Dry and other lower bidding contractors.

6

**Laying Groundwork for Plan to Loot Plaintiff's House**

18.   The seeds for defendants' plan to steal the contents of plaintiff's basement while pretending to be performing remediation work in a hazardous environment took the form of persistent lies by Winberg, stressing - without any laboratory testing - that the basement mold remediation work could not be delayed in the interest of plaintiff's husbands' health combined with Winberg's false representations to win the plaintiff's confidence, such as:

1. Premier could start the work sooner than the competing contractors, whose prices were several thousand dollars lower;

2. Winberg would personally supervise the remediation work;

3. Before the remediation work began, he would personally work with the Contes in "tagging" the items that they would retain and items they would discard; and

4. The plaintiff and her husband would be able to decide which items to be "tagged" for disposal.

19.    Each of Winberg's representations proved to be totally false because:

1. Premier could not have lawfully started the work on the Contes' home without having a proper home improvement contract signed by the Contes;

7

2. Premier was not licensed to conduct home improvement services in New Jersey, pursuant to the New Jersey law requiring the Pennsylvania company to be registered with the New Jersey Secretary of State (N.J.S.A. 14:13-3);

3. As plaintiff learned from "Peter" who was in charge of the Premier work on her house on February 28, 2018, in the presence of her sisters Janet and Teresa Guarino, defendant Winberg was not supervising her job, and was "gone all day" supervising another job; and

4. Contrary to Winberg's representation that a selection and tagging process would be conducted to save from disposal the stored items of value to the Contes, no such process occurred. Instead, on February 28, the unsupervised workers were invited by Premier to take whatever property they wanted.

### The Premier Contract

20. On February 22, 2018 defendant Winberg presented a Premier Proposal document signed only by the Premier to address the water infiltration and mold remediation in the amount of $21,000.

21. The Contes explained that they were not in a position to enter into the contract without financial aid from her sisters, to which Winberg remarked that he could resolve

that problem with "Green Sky", a financial company with which he worked to obtain financing for his customers.

22.   In order to facilitate her sister's urgent need for Premier's services Janet Guarino signed a Green Sky financing agreement for the $21,000 Premier contract

23.   Although the defendants had not signed a contract to perform any remediation services, Winberg set a *start date* of February 28, 2018 on the project in violation of Consumer Fraud Act mandating a written contract fully signed before the start of work.

24.   To reduce the chance of their planned looting of the Contes' stored property being discovered, Winberg told plaintiff and her husband that they should vacate their house when the work was in progress, discouraging them from entering into the mold removal area without protective clothing and masks and telling plaintiff and her husband *not to enter the basement when there was a plastic curtain hung from the ceiling.*

25.   In hindsight, the plaintiff Conte realized that the defendants chose to start work on February 28, 2018 without having a signed contract in violation of the New Jersey Consumer Fraud Act because Winberg was aware that the plaintiff and her husband had to be in Philadelphia for a doctor's appointment on that date.

9

26.    In hindsight, the plaintiff realized that the purpose of the plastic curtain was to serve as a sight barrier behind which Premier's theft of the entire contents of the Contes' cellar on February 28, could be accomplished in a single day, without being interrupted or detected.

27.    In hindsight, having seen that their entire basement was looted by men wearing tee shirts and no breathing masks, and that there was not even a pretense about tagging and individual pieces of  property for retention, the plaintiff realized that Winberg lied to her and her husband about the dangerous conditions in their basement and as to his commitment to working with plaintiff in the selection of their property to retain.

**The Heist**

28.    Upon returning from the Philadelphia medical appointment on February 28, 2018, plaintiff observed a Premier worker carrying off her expensive Fortunoff patio chair and umbrella set, loading it into his van.

29.    In response to plaintiff's directive to return the items to where he found them, the worker tossed them onto the ground, saying that he was told that the Contes did not want the stored items and that he could keep what he wanted.

30.    In response to plaintiff's phone call to Winberg, reporting the theft of her property and what his worker was told about keeping what he wanted, Winberg said that the employee who took the property *would be fired.*

31.    Following up on plaintiff's phone call, defendant Winberg came to her home and went into the basement with plaintiff, observing that all plaintiff's property was gone.

*32.*    When asked where the property went, Winberg offered to make a call to the dumpster company to see if he could locate the property, only to report that he *could not get them back.*

33. Shortly after her complaint to Winberg, plaintiff found a large container deposited by persons unknown on her front lawn containing Christmas lights and decorations that had been removed from her basement.

34.    Defendants Winberg and Shear made no further effort to locate or return her property to her, now claiming that the removal was performed by a subcontractor, not in his employ.

35.    Operating secretly and contrary to the express wishes of the plaintiff and her husband to retain as much of their stored property as they chose to retain, the defendant Premier and its key principals, Winberg and Shear unlawfully allowed and permitted their employees or agents to remove

*all of the stored items* in the basement, including items which were stored in dry sections of the basement and which plaintiff and her husband valued and did not want to be put into a dumpster as waste for disposal or to be taken and kept by the workers.

### Unauthorized Wall Finishes and Untouched Rafter Mold

36.    During the time that she was negotiating the scope of the work and materials to be used, plaintiff made it clear to defendant Winberg that she wanted the cellar walls, after they were treated for moisture prevention and mold removal, to be simply covered with a plain white coating of a suitable paint product.

37.    Since the basement had no supplied heating, there was no purpose to be served by installing what appeared to be a form of insulation material on the wall's interior surface.

38.    However, on entering the basement to observe the disappearance of virtually all of their stored personal property, plaintiff was struck by the appearance of a "silvered" wall covering on the interior of her basement wall.

39.    When she reached defendant Winberg by phone, she exclaimed    "how dare you not consult with me before doing this to the wall?" to which he responded: "It's too late." and  "You should be happy -- it will make you warmer."

40.    When plaintiff demanded that the installation be taken down, Winberg responded dismissively: *"That was not going to happen"*.

   **"Shoddy, Second-String, Work."**

41.    On March 23, 2018, the Premier owner, defendant Sam Shear, made his first appearance at the Conte premises.

42.    On his review of the basement work of his company he described the work to plaintiff and her sisters Teresa and Janet Guarino as *"second string"* and *"shoddy work."*

**Return of Water Intrusion - Right-Hand Man Pablo**

43.    Beginning on March 23, 2018, plaintiff dealt directly with defendant Shear as "owner" of Premier.

44.    In response to plaintiffs' complaint that she had not authorized the silvery finish that was applied to her basement walls defendant Shear applied a new layer of wall covering which was brown in color.

45.    In response to plaintiff's complaint that water was continuing to enter the basement, defendant Shear assigned Pablo, his "right hand man", to redo the entire area under the basement steps by breaking the concrete and replacing it.

46.    Pablo's comments were that the job was not done right by the "second string" workers but was now corrected by his "first string" team.

47.    In response to plaintiff's report that she and her husband were deceived by his company, defendant Shear stated that he had fired Peter, and asked: "what else do you want me to do?" and "How can I make this right?"

48.    Although plaintiff reported to the owner that she wanted her money back because the job was inferior and incomplete, defendant Shear offered to perform repair work on her sidewalk and driveway in compensation for Premier's "shoddy work."

**Premier's Failure to Remove Visible Mold**

49.    Despite his claims of urgency to remove the basement mold in the interests of Mark Conte's health, neither Winberg nor "Peter" (who was left in charge by Winberg) removed the mold which was easily visible on the exposed first floor framing (floor joists and bracing overhead in the basement).

50.    Despite defendants' failure to complete the mold removal process, by March 15, 2017, defendants drew down the total price of the proposal months before its work was completed and accepted by the Contes.

51. After many attempts to get a satisfactory response from Premier as to the completion of the basement mold removal and the other promised work on August 24, 2018,

plaintiff declared to defendant Shear by phone that she was "finished with him".

52.    On September 18, 2018, plaintiff engaged mold removal expert Ray Nabi who confirmed that Premier had not removed the mold accumulated on the basement rafters which were tested to be unacceptable.

53.    Plaintiff Conte proceeded to remove the mold using products and equipment commercially available for such purposes.

## Financing Fraud

54.    As set forth in greater detail in Count III, Plaintiff Janet Guarino entered into a financing agreement on behalf of her sister and brother-in-law, with "Green Sky", a financial company utilized by Premier to allow its customers to engage Premier to perform home improvements, allowing Premier to draw down payments directly from the financing company.

55.    The financing agreement was signed for a total principal amount of $21,000 equal to the Premier total price for its contracted work.

56.    The terms of the Green Sky financing agreement expressly prohibited Premier from passing on to the borrower Green Sky's $4,200 charge to its participating merchants for its services.

57.    In violation of that restriction, and in a deceptive manner, Premier sent an invoice to plaintiff Guarino on which

it added to the $21,000 total contract price, the sum of $4,000.00. for a total invoice of $25,000. (Exhibit A)

58.  In response to plaintiff Guarino's question about the added $4,000.00 charge, defendant Winberg stated that it was the finance fee charged by Green Sky, not mentioning to her that Premier was prohibited from passing that fee on to the customer.

59.  Being unaware of that prohibition, plaintiff Guarino paid the full $25,000.00 amount of the fraudulent invoice including interest on that amount.

## COUNT I

**(All Defendants -- Breach of Contract, Unjust Enrichment)**

60.  All allegations set forth in the above "General Allegations" section are incorporated herein by reference as though set forth in full below.

61. Despite its failure to prepare a lawful contract for the purposes of complying with the Home Improvement Practices regulations of the N.J. Division of Consumer Affairs, the defendants' actions in providing such services as outlined in its February 15, 2018, proposal (Exhibit B) support plaintiffs' action for damages arising from defendants' breach of an oral common law contract.

62. As set forth above in detail, the defendants breached their common law contract by:

a. Failing to complete the services for which they received more than the proposed and agreed total project price;

b. Failing to remove the mold on the ceiling (consisting of exposed joists and cross braces supporting the first floor above the basement);

c. Inducing or allowing their employees, subcontractors or agents to remove the entire contents of the Conte's basement and to keep or otherwise dispose of them;

d.     Removing and converting to their own use and benefit, or disposing in an irresponsible manner many items of personal and material value to the plaintiff and her husband which were stored in the basement and which were not contaminated or beyond salvage, without notice to the plaintiff and without her authorization;

e.     Applying unwanted and unspecified wall finish material to the basement walls without notice to or approval of the plaintiff as a deviation from the plaintiff's order and instructions which were required to have been reduced to specific terms of a written, signed home improvement contract; and by

17

f.      Altering the price of the contract set forth on the Proposal from $21,000 to $25,000 in violation of the terms of the proposal and in breach of the defendants' third-party benefit set forth in the Green Sky/Merchant Program Agreement.

63.  As a direct, proximate and foreseeable consequence of the defendants' contract breaches, aforesaid, plaintiff Conte has incurred monetary losses and is entitled to compensation by the defendants for:

1. The reasonable costs of engaging a professional mold expert to confirm the continued presence of mold in her base less the costs of removing the mold and related growth from the basement ceiling superstructure, and for the application of such preventive materials as called for in the defendants' Proposal;

2. The reasonable costs of removing the unwanted basement wall finishes installed by the defendant against the wishes of the plaintiff and the preparation of the walls for recoating with an appropriate finish as requested at the inception of defendants' engagement;

3. An accounting of the personal property removed by the defendants as to each item disposed of and of the manner of disposition and the proceeds received for their resale;

4. Compensation for the reasonable value of all such salvageable property removed by defendants on February 28, 2018; and

5. The alteration of plaintiff Guarino's finance agreement to recover defendants' $4,200 Green Sky fee charged to defendant under its Merchant Financing Program which expressly protects the plaintiff as the Borrower against having that fee added to the Merchant's service transaction, together with the interest charges paid by plaintiff for defendants' $4,200 GreenSky fee.

64. Should the defendant's proposal and services be deemed to be other than an enforceable contract, the plaintiff seeks equitable relief in the form of restitution based on the doctrine of unjust enrichment arising from Premier's retention of the full $25,000 it obtained inequitably based on its failure to provide value for the amount of money received and by sheer fraudulent overbilling.

WHEREFORE, the plaintiffs demand judgment against the defendants, jointly and severally for compensatory damages in such amount as shall be established at trial together with costs of suit and such other relief in as the Court may deem equitable.

## COUNT II

(All Defendants - Consumer Fraud – Unconscionable Business Practices including Material False Representations as to Urgency of Mold Removal, False Promises to Preserve Salvageable Property, Supervision of Work and Failure Drawing Full Amount of Green Sky Fund with Work Unfinished)

65. All prior allegations are incorporated in this Count as though repeated herein.

66. The services undertaken by the defendants constituted a home improvement regulated by the Home Improvement Practices regulations adopted under the Consumer Fraud Act, (N.J.A.C. 13:45-16.2), hereinafter "the regulations".

67. The defendant Premier violated the Consumer Fraud Act by being an unregistered Foreign Company soliciting home improvement contract work by misrepresenting in its Proposal that it was authorized to do business in New Jersey.

68. The defendants commenced remediation work on February 28, 2018 and continued the work into the month of August without ever having entered into a signed written contract stating the entire scope and the terms and conditions as it pertains to the work to be done, consideration to be paid, and other requirements of the Home Improvement Practice regulations of New Jersey Division of Consumer Affairs (N.J.A.C. 13:45A-16.2(a)12) ("HIP").

20

69. As a direct consequence thereof, the plaintiff was deprived of a clear statement of the terms that she and the defendant Premier's principal orally discussed and agreed upon, resulting in the defendants' taking it upon themselves to do such things as:

1. Causing the removal and conversion to defendants' own use or benefit, or to the benefit of its employees, subcontractors or agents for the discarding, or reselling of all of the plaintiff's stored items without her input as to which she deemed salvageable or valuable enough to her to retain despite their condition;

2. Installing undesirable wall material on the basement walls instead of painting the walls with a simple white colored suitable material;

3. Abandoning the incomplete project and substandard work and materials without removing the extensive mold growth on the basement ceiling; and

4. Retaining the full $25,000 GreenSky transaction loan account established for the plaintiff's restoration before the work was finished and accepted, as required by the HIP.

69.    As the direct, proximate and foreseeable consequence of the aforesaid violations of the Consumer Fraud Act the plaintiff sustained substantial, ascertainable losses of

money and property as set forth herein for which the defendants are liable to her.

**WHEREFORE**, the plaintiff demands judgment against the defendants, jointly and severally, for compensatory damages, statutory treble damages, nominal damages, interest, costs of suit and attorneys' fees.

## COUNT III

(All Defendants – CFA Violation Fraudulent Charge-back of Finance Charges)

70. All prior allegations are incorporated herein as though set forth in full.

71. Without being conscious of the statutory and regulatory requirements for home improvement contracts, the plaintiffs entrusted the project to the defendants based solely on defendant Winberg's false claims of hazardous mold requiring extensive protective gear during the extensive selection process for preserving the salvageable stored personal property in the basement and his false promise of monitoring the workers, during the process, all without the protection of a fully signed contract, with a required start and end date.

72. As a further incentive to pay its $21,000 price for the mold removal and remediation, defendant Winberg offered to arrange "low rate" financing through "Green Sky" with

22

which it had a business relationship under its Green Sky/Merchant Finance Program.

73.  Because plaintiff Conte was unable to finance the Premier contract price of $21,000, defendant Winberg arranged for her sister, plaintiff Janet Guarino, to be eligible to finance the project through a company which provides such services in aid of home improvement contactors, including Premier.

74.  The terms of that three-way arrangement required plaintiff Guarino to authorize GreenSky to advance money to Premier as when requested by Premier (through Green Sky) and authorized by plaintiff Guarino.

75.  Because neither plaintiff Conte nor plaintiff Guarino had experience in construction financing or installment payments, and because there was no procedure by which Premier was required to provide proof to plaintiff Guarino or to the Contes as to how much of the $21,000 contract price had been earned by Premier, neither plaintiff nor her sister were aware that Premier was drawing more money from the $21,000 account than it was entitled to, especially in view of the amount of money that was lost on the first day of their work due to the Premier's unauthorized disposal and asportation of thousands of dollars of personal property from the plaintiff's basement.

76.    Paragraph 5. b. of the Green Sky financing Terms required Premier to pay to Green Sky a $4200 "financing charge" which Premier was not permitted to charge back to the plaintiff or to her sister, plaintiff Guarino as an individual customer.

77.    Under Consumer Fraud Act Section N.J.S.A. 56:8-151 "Contracts – contents", defendants' contract with plaintiff was required to set forth in understandable language "*the total price or other consideration to be paid by the owner, including finance charges.*"

78.    The violation of that statute is also an unlawful business practice pursuant to the Division of Consumer Affairs Home Improvement Practices regulation N.J.A.C. 13:45A-16.2 (a) 6. v.

79.    The defendants' unsigned contract proposal stated the total price to be $21,000, (in black type) without any mention of "finance charges" to be added. (Exhibit B)

80.    In violation of N.J.S.A. 56:8-151 and N.J.A.C. 13:45A-16.2 (a) 6. v., defendants mailed a falsified invoice to plaintiff Guarino for payment of an additional $4,000 which was typed in red ink adding to $25,000.

81.    When called to the attention of defendant Winberg, his written response (Exhibit C) identified the new number as including Premier's finance fee to GreenSky, without

disclosing that he was prohibited Paragraph 5. b. of GreenSky's Terms and Conditions of financing Premier's contracts from passing that fee on to the customer.

82.   Not being familiar with the GreenSky provision (Para. 5 b.) which protects her against being charged by the Premier for its fee paid to GreenSky, plaintiff Guarino paid the full amount of the Premier Invoice plus the Premier's financing fee and interest cost totaling $4,000.

83.   By demanding and receiving the total contract amount on an unfulfilled, abandoned remediation project before it was completed, defendants Winberg, Shear and Premier constituted an unlawful business practice pursuant to the Division of Consumer Affairs Home Improvement Practices regulation N.J.A.C. 13:45A-16.2 (a) 6. v.

84.   By mailing the falsely increased invoice for payment, the defendants committed mail fraud in violation of 18 U.S.C.S. § 1341.

**Defendant Premier Unregistered to do Business in New Jersey**

85.   Although defendants Shear and Winberg and Premier registered with the N.J. Division of Consumer Affairs as Home Improvement Contractors,  Premier was not registered in New Jersey as a foreign (out of State) company to conduct any form of business in New Jersey as required by N.J.S.A. 14A:13-3.

86.   Even if it had been registered as a foreign company to do business in New Jersey, Premier and its principals Winberg and Shear violated the most fundamental requirements of the Home Improvement Practice regulations of New Jersey Division of Consumer Affairs [N.J.A.C. 13:45A-16.2(a), and of the Consumer Fraud Act, N.J.S.A. 56:8-151a which required:

a.   A contract signed by the plaintiff and by the Premier's executive officer;

b.   Setting forth a full description of the services to be rendered;

c.   Setting for the dates and time period on or within the work is to begin and be completed by the defendants;

d.   Setting forth the legal name and business address of the sales representative or agent who solicited or negotiated the contract.

**WHEREFORE**, plaintiffs Laraine Conte and Janet Guarino demand judgment against the defendants, individually and severally, for compensatory damages, statutory treble damages, nominal damages, interest, costs of suit and attorneys' fees.

## COUNT IV

(Legal Fraud, Tortious Asportation and Conversion
of Property Compensatory and Punitive Damages)

87.    All prior allegations are incorporated in this Count
as though repeated herein.

88.    Prior to signing defendant Premier's contract to
remediate the moisture and mold condition of her basement,
plaintiff made it very clear to defendant Winberg that she
would not permit the contractor to discard any or all of her
personal property stored in the basement other than items
that she and her husband agreed to part with or store
elsewhere to facilitate the contractors' work.

89.    To assure plaintiff of his company's intent to honor
her right to determine which of the stored items were to be
discarded, defendant Winberg represented to plaintiff that he
or another Premier employee would work with her in the
basement tagging items which were approved for disposal.

90.    To further assure her of the company's commitment to
the protect her to the review process, plaintiff was
cautioned that she would need to be dressed in Hazmat
overalls and wear a protective breathing mask.

91.    Between the date of plaintiff Conte's signing the
Premier contract and the February 28, 2018, defendant Premier
failed to schedule an item review session with the plaintiff.

27

92.    On February 28, 2018, plaintiff's husband had a doctor's appointment in Philadelphia, Pennsylvania which caused them to be absent from their home for most of the day.

93.    On plaintiff's return, she encountered a Premier worker heading to his vehicle with her Fortunoff patio chairs and umbrella set, being told by the worker that he was permitted by defendant Winberg to take the property for himself.

94.    That encounter led to plaintiff's discovery that virtually all of the personal items in her basement had been removed.

95.    When confronted by plaintiff with this accusation, defendant Winberg admitted that he made that decision and told plaintiff that it was for her own good.

96.    In response to her demand made initially to defendant Winberg, and repeated to defendant Shear, the owner of Premier, both defendants claimed that they could not return the items to her because they had been taken away by people who were not Premier employees and could not be traced.

97.    By intentionally exercising control and dominion over property owned by the plaintiff and her husband, and disposing of it in an untraceable manner in violation of her legal right of possession and control, the Premier defendants, including Shear and Winberg acted unlawfully and

28

maliciously with reckless disregard of her property rights, her personal attachment to the disposed of items, and her financial interests.

98.    By using stealth and deception to prevent plaintiff Conte from observing their obviously planned looting of her stored property, the defendants' actions constitute an evil-minded intent to steal plaintiff's property, warranting the award of punitive damages in addition to all of the statutory remedies.

WHEREFORE the plaintiffs demand Judgment against the defendants Premier, Shear and Winberg jointly and severally for:

A.    Compensatory Damages in such amount as shall be established at trial as representing the loss of their personal property, including memorabilia and things of utility and monetary value;

B.    Nominal Damages for such losses which are not capable of being quantified;

C.    Punitive damages; and

D.    Costs, interest and attorneys' fees.

### COUNT V

### (Negligence)

99.    All prior allegations are incorporated in this Count as though repeated herein.

100.   On February 28, 2018, knowing that the plaintiff and her husband would be in Philadelphia Pennsylvania for a medical appointment, defendant Premier and its President negligently permitted workers not employed by Premier and with whom they had no means of communication to begin the process of removing personal property of value to the plaintiff and her husband, which had been stored in their basement.

101.   Defendant Premier, acting through defendants Shear and Winberg, negligently failed to inform the workers that, because the variety of items stored in the basement had intrinsic value as musical instruments, artistic pieces, and sentimental value as family memorabilia, before they started removing any items from the basement, plaintiffs were to review each item along with defendant Winberg to tag them either for disposal or for retention.

102.   Defendants' negligence extended to its failure to instruct the workers who removed plaintiff's personal property from the basement to store them in a place and in a manner which would protect them against damage and theft.

103.   It extended to their failure to notify the plaintiffs as to the reason why it decided to omit the review process and why it permitted all of the contents of the basement to

be removed why it permitted the removed articles to be kept by the workers.

104.    Apart from Premier's negligent retention and non-supervision of the unknown workers, Premier negligently failed to instruct the workers who were assigned to perform the work needed to abate the water infiltration into the basement and the removal of mold which had grown on the surfaces of the walls and the first floor framing wood which was fully visible above the basement floor.

105.    In response to plaintiffs' complaints to defendant Shear that the work in the basement had failed to cure the water infiltration issues and left visible mold remaining in the cellar framing, the plaintiff was advised by one of the Premier workers that the work was substandard and had not been properly supervised.

106.    Such negligence accounted also for the failure of Premier's workers to comply with plaintiffs demand that the basement wall be finished with a non-conspicuous paint rather than applying a shiny material to the block wall.

107.    As the foreseeable consequence of Premier's failure to supervise the quality of its work by its employees or subcontractors, the plaintiff was required to expend her own resources to complete the unfinished work.

WHEREFORE the plaintiff demands Judgment against the defendants Premier, Shear and Winberg jointly and severally for:

    a. Compensatory Damages in such amount as shall be established at trial as representing the loss of their personal property, including memorabilia and things of utility and monetary value;

    b. Nominal Damages for such losses which are not capable of being quantified;

    c. Compensatory damages for loss of use and enjoyment of their basement and their personal property and for the costs of completing the negligently performed and suspended work; and

    d. Costs of suit, interest and attorneys' fees.

## COUNT VI

### Successor liability

(Defendant New Premier Waterproofing LLC, and PABLO COLON Individually and as President and Owner of New Premier Waterproofing, LLC and as a Managerial Employee of Defendant Premier Waterproofing, LLC, During its Consumer Fraudulent Services to Plaintiffs Conte and Guarino)

108.   All prior allegations are incorporated in this Count as though repeated herein.

109. In 1994, the New Jersey District Court in <u>Glynwed,</u>

<u>Inc. v. Plastimatic, Inc</u>., 869 F. Supp. 265, 275-76

(D.N.J. 1994), identified the four factors which

determine whether, when one company transfers its

business interests to another company, the transaction

is a *de facto* consolidation or a mere *continuation*:

> ...[M]ost courts consider four factors: (i)
> continuity of management, personnel, physical
> location, assets, and general business
> operations; (ii) a cessation of ordinary business
> and dissolution of the predecessor as soon as
> practically and legally possible; (iii)
> assumption by the successor of the liabilities
> ordinarily necessary for the uninterrupted
> continuation of the business of the predecessor;
> and (iv) continuity of ownership/shareholders.
> Philadelphia Elec. Co., 762 F.2d at 310
> (Pennsylvania Law citations omitted);
> Lumbard, 621 F. Supp. at 1535 (New York law)
> (citations omitted); Menacho, 420 F. Supp. at
> 133 (New Jersey law) (quoting McKee v. Harris-
> Seybold Co., 109 N.J. Super. 555, 264 A.2d 98
> (Law Div. 1970), aff'd, 118 N.J. Super. 480, 288
> A.2d 585 (App. Div. 1972)); Fletcher, §7165.5
> see also Luxliner, 13 F.3d at 73 (Glenwyd,
> supra/.)

110.    The documented and undisputed facts of this

transaction narrate Sam Shear's continuation of Premier

33

Waterproofing, LLC, which he founded and operated as its president decades earlier, by phasing Premier Waterproofing out and creating New Premier Waterproofing, LLC in 2023 installing his trusted Premier foreman, Pablo Colon, to be the owner and president.

111.    To announce the transition from Premier to New Premier defendant Shear posted a final Premier Web Page noting its closing.  Simultaneously he notified the viewers of the advent of New Premier Waterproofing, LLC on the same web site.

112.    On December 8, 2023 Google Maps posted a customer review by Kelly Lavin who wrote:

> Pablo has been in this industry for 20 years with Premier Waterproofing in the area who have since gone out of business but also had a great reputation – hence the name New Premier Waterproofing. Can't recommend them enough.

113.    Prior to now, Pablo was not made a party defendant to this suit because he was not known to have caused Plaintiffs' damages and losses as detailed in the first 50 paragraphs of this Third Amended Complaint.

114.    Because both companies appear to have utilized the same materials and techniques in their businesses as visible in published photos of their interior work, and because the

34

final publication of Premier's Web Page directs the viewer to the advent of "*New* Premier", the plaintiffs have reason to believe, subject to pre-trial discovery, that *New Premier* is the *offspring* of the former Premier with a *new* Pablo Colon as its President.

115.    Finally, regarding Pablo Colon's genetic links to Sam Shear's and Mike Winberg's mischief-making in the first 50 paragraphs of the Third Amended Complaint, the linkage springs from the times in 2018, when Laraine Conte and her sister Janet Guarino were consoling each other over the loss of the Contes' "basement treasures".

116.    The plaintiffs have reason to believe and therefore, subject to discovery, allege that when Mike Winberg wrote his detailed confession on March 33, 2018[1] that he let his workers carry off the Conte's stored furniture, lamps, phonographs, and musical instruments and lawn furniture (with an estimated value of $43,000), others close to him at Premier would have known the truth from the beginning and would have carried that truth with them in their *New Premier DNA*.

117.    Therefore, the plaintiffs cannot rule out the possibility that the truth of that "heist" would have reached Pablo Colon's attention - meaning only that, if so, he has

---

[1]  Winberg March 33, 2018 email to Laraine Conte.  Pa....

two strands of guilty knowledge about the tortious actions of their prior employer, which is imputed to the principals of the defendant companies.

118.    Wherefore the plaintiffs demand judgment against all parties to this action including the Premier Waterproofing, LLC, New Premier Waterproofing, LLC, Sam Shear, Mike Winberg, and Pablo Colon, jointly and severally, for each an all the damages sought demanded by the plaintiffs in each of the preceding Counts, together with Interest, litigation costs and Attorney's fees.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby Demand Trial of all Issues by a Jury of Twelve.

### DESIGNATION OF TRIAL COUNSEL

In accordance with R.4:25-4, George T. Dougherty is hereby designated as trial counsel for the plaintiffs in the above matter.

### NOTICE TO THE ATTORNEY GENERAL

Pursuant to the provisions of N.J.S.A. 56:8-1 et seq. notice of the within action, and a copy of the complaint have been served upon the Attorney General of the State of New Jersey.

## CERTIFICATION PURSUANT TO R. 1:38

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

## DEMAND FOR DISCOVERY OF INSURANCE INFORMATION
## PURSUANT TO R. 4:10-2(b)

Pursuant to R. 4:10-2(b) demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment ( )YES ( )NO. If the answer is "yes", attach a copy of each or in the alternative state, under oath or certification (a) number; (b) name and address of the insurer or issuer; (c) inception and expiration dates; (d) name and address of all persons insured thereunder; (e) personal injury limits; (f) property damage limits; (g) medical payment limits; (h) name and address of person who has custody and possession thereof; (i) where and when each policy or agreement can be inspected and copied.

37

## NOTICE PURSUANT TO RULE 1:5-1A AND 4:17-4C

Please take notice that the undersigned hereby demands, pursuant to the above cited Rules of Court, that each party serve pleadings and Interrogatories and receiving Answers thereto serve copies of all such pleadings and answers to Interrogatories and all documents, paper and other material referred to herein, received from any party, upon the undersigned attorney and take notice that this is a continuing demand.

## CERTIFICATION OF NO ACTIONS PENDING

Pursuant to R.4:5-1, I hereby certify that to the best of my information, knowledge, and belief the matter in controversy is not the subject of any other action or arbitration proceeding and no other action or arbitration proceeding is contemplated.  I also certify that to the best of my information, knowledge, and belief there are no other parties who should be joined in this action.

George Dougherty Law Office
Attorneys for Plaintiffs

By: _____
    George T. Dougherty

March 5, 2024